EDWARD ROSE BUILDING COMPANY v
INDEPENDENCE TOWNSHIP

Docket No. 82572. Argued December 6, 1989 (Calendar No. 5). Decided
September 28, 1990.

Edward Rose Building Company challenged 1981-84 property tax
assessment valuations of vacant improved lots in its residential
subdivision in Independence Township, Oakland County, alleg-
ing that the true cash value of the property should have been
based on comparable multilot sales to builders, rather than on
comparable sales of individual lots. A hearing officer deter-
mined the true cash value on the basis of individual lot sales.
The Tax Tribunal vacated the hearing officer's conclusions and
adopted the township's valuation per individual lot, but dis-
counted each assessment to reflect market value. The Court of
Appeals, SHEPHERD, P.J., and HOOD and T. M. BURNS, JJ.,
affirmed in part and reversed in part, finding that the market
approach was the most accurate method of valuation, but that
the application of the discount was error (Docket No. 91631).
The petitioner appeals.

In an opinion by Justice GRIFFIN, joined by Chief Justice
RILEY and Justices BRICKLEY, CAVANAGH, BOYLE, and ARCHER,
the Supreme Court held:

The Tax Tribunal adopted wrong principles in measuring the
true cash value of the petitioner's property on a discount basis.

1. Real property is to be uniformly assessed at fifty percent
of its true cash value, the price which could be obtained for the
property at a private sale. Generally, different parcels of land
under the same ownership are to be regarded as separate units
and must be valued and assessed separately. In this case, the
tribunal expressly accepted the individual assessments of the
lots by the township; however, it inappropriately discounted the
valuations, disregarding factors essential to accurate computa-
tion of true cash value.

2. Highest and best use is a concept fundamental to the
determination of true cash value which recognizes that the use
to which a prospective buyer would put the property will
influence the price the buyer would be willing to pay. In this
case, the parties' experts agreed that the highest and best use
of the property is as single family residential lots. While the

application of a multilot discount may be appropriate in measuring the investment value of raw land or unimproved subdivision lots, it is inappropriate in measuring the value of improved property if put to its highest and best use.

3. Ad valorem taxation must be uniform both in the rate of taxation and the mode of assessment. The controlling principle is one of equal treatment of similarly situated taxpayers, which compels the assignment of values to property upon the basis of true cash value and not the manner in which it is held. The fact of ownership is not germane in determining value. In this case, the tribunal's mode of assessment violated the mandate of uniformity. Affording a discount to the multilot owner provides advantageous treatment upon the basis of a factor unrelated to the land itself which would produce an inherent preference in favor of developers as opposed to taxpayers who own single or scattered lots.

Affirmed and remanded to the Tax Tribunal for further proceedings.

Justice LEVIN stated that there was sufficient evidence to support basing the assessments of the lots in question on wholesale values. In doing so, the Tax Tribunal neither committed fraud or error of law, nor did it adopt a wrong principle. There is overwhelming evidence that there was a wholesale market and that the differential between the wholesale and retail markets was greater than the discount allowed by the Tax Tribunal.

The Tax Tribunal did not err in ignoring that the petitioner had not offered the lots for sale to other builders or to consumers, and in finding that a land developer who had one hundred lots for sale would ordinarily and realistically sell them to buyers at a wholesale discount from what the buyers would sell them to home buyers, and in concluding that in the tax years there was a wholesale market with a usual selling price, true cash value, less than the consumer's retail market for the very same lots. The tribunal saw the petitioner as a merchant who performs the service of marketing a lot to a consumer that adds value to the lot when, and not before, the lot is actually so marketed to a particular consumer. That is a value land developers, and hence the market, recognize by their willingness to sell lots, for less than consumers will pay, in quantities to builders who perform that service. And that is a value consumers recognize by their willingness to pay more for a lot than a builder pays.

The record establishes that there were two usual selling prices of lots, the wholesale usual selling price to builders, and

the retail usual selling price to consumers. The concepts of usual selling price/true cash value do not require or permit the Tax Tribunal to ignore, as a matter of law, relevant and material evidence of a fact bearing on the determination of usual selling price/true cash value: the usual selling price of a quantity of lots to builders.

As any product moves along a chain of production from owner to owner, value is added to it without regard to whether the product is changed. That addition of value is reflected in a higher price for the product; this is the conception on which the value-added tax rests. At each step along the chain of production, value is added to the product, the price of the product increases, and the product is sold into a new market. The value of the product to the owner at any point along the chain of production is in part a function of the market into which the product will be sold.

The concern that recognizing that there are two different markets, a wholesale market where lots are sold to builders and a retail market where lots are sold to consumers, would violate the constitutional mandate that the Legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property not exempt by law ignores a fundamental difference between a lot that has been sold and a lot that is unsold. A lot that has been sold has been marketed to a consumer, while a lot that remains unsold has not. Just as value is added to vacant land when it is purchased, platted, and improved, so, too, is value added to platted subdivision lots when they are marketed to a consumer. Until the costs involved have been incurred, and the value that is added by marketing a lot to a consumer has, in fact, been added, the lot truly is worth less than a lot that has been marketed to a consumer. Representing the difference between a lot that has been marketed to a consumer and one that has not as being tantamount to treating one owner differently than another is a false characterization that obscures the real economic difference between a lot, the value of which has been enhanced by marketing it to a consumer, and a lot the value of which has not been so enhanced.

Tangible personal property is subject to ad valorem personal property taxation. Inventories were, until exempted as of the 1976 tax year, required to be valued essentially at cost, and tangible personal property has been generally taxed at historical cost less depreciation. Those modes of valuing tangible personal property have been the means by which the true cash values of inventories of manufactured products and tangible

personal property were and are reported for ad valorem personal property taxation. Nevertheless, establishing the true cash value of inventories essentially at cost and of tangible personal property at historical cost less depreciation, has been thought to be appropriate although other modes of valuation, e.g., comparable sales, were and are employed for valuing real property.

Uniformity of taxation does not refer to the method of valuation by which the true cash value is determined, but to the proportion of true cash value at which all property should be assessed, now constitutionally and statutorily fixed at fifty percent. If the usual selling price of the one hundred lots was accurately determined on a wholesale basis, and the usual selling prices of comparable lots was accurately determined on a retail basis, and all the lots are assessed at fifty percent of the usual selling price, there would be no violation of the principle of uniformity. Each lot or group of lots would then have been assessed at the same proportion of its accurately determined usual selling price. Uniformity of taxation is disturbed when property is assessed at differing proportions of the usual selling price, not when different modes of valuation are employed to arrive at the usual selling price. Recognizing the difference between a wholesale and a retail market price simply recognizes the usual selling price to the owner, whether builder or consumer.

The General Property Tax Law does not require that true cash value be determined on a retail basis. Lots can be as readily assessed on an individual or separate basis employing a wholesale value as a retail value. The requirement of separate assessment, lot by lot, does not preclude consideration of evidence of sales of comparable lots in quantities or valuation of lots on a bulk basis. The requirement of separate assessment does not change the meaning or definition of usual selling price/true cash value, and does not justify ignoring evidence of usual selling prices and market values established in a wholesale market.

The highest and best use conception concerns the use to which property can be put and not the market in which it is sold. The one hundred lots in this case were put to the same use whether the petitioner itself built and sold houses on the lots, or employed a selling organization to sell the lots at retail prices to consumers, or sold the lots itself to builders at a wholesale price.

There was ample evidence of a wholesale builder's market. The Tax Tribunal did not commit error of law in considering

evidence of comparable sales in the wholesale builder's market, together with the evidence of comparable sales in the retail consumer's market, in determining the true cash values of the lots in the tax years in suit.

164 Mich App 324; 416 NW2d 433 (1987) affirmed.

*Honigman, Miller, Schwartz & Cohn* (by *Charles H. Tobias, Thomas J. Beale,* and *Ralph R. McKee*) for the petitioner-appellant.

*Kohl, Secrest, Wardle, Lynch, Clark & Hampton* (by *Gerald A. Fisher*) for the respondent-appellee.

Amici Curiae:

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Richard R. Roesch* and *Ross H. Bishop,* Assistant Attorneys General.

*Miller, Johnson, Snell & Cummiskey* (by *Eric J. Thorsen* and *Robert J. Christians*) for Builders Association of Southeastern Michigan.

*Miller, Canfield, Paddock & Stone* (by *Samuel J. McKim, III, P.C.,* and *Joanne B. Faycurry*) for Michigan Municipal League.

*Bauckham, Reed, Sparks, Rolfe & Thomsen, P.C.* (by *Patricia R. Mason* and *John H. Bauckham*), for Michigan Townships Association.

GRIFFIN, J. We are called upon to review a determination by the Michigan Tax Tribunal of the true cash value of certain real property owned by the petitioner, a developer. The central issue is whether a group of vacant improved subdivision lots owned by petitioner can be valued utilizing a wholesale discount, resulting in a lower assessed valuation than if each lot had been individually owned. Under the circumstances presented in this

case, we conclude that the tribunal adopted wrong principles in measuring the true cash value of petitioner's property on a discount basis. We therefore affirm the decision of the Court of Appeals.

I

This appeal involves tax assessment valuations for the tax years 1981 through 1984. Petitioner-appellant Edward Rose Building Company, a housing developer, owned one hundred vacant lots in a platted single-family residential subdivision known as Lake Oakland Woods in Independence Township, Oakland County. Roads, utilities, sewer, and water had been installed in the subdivision. Petitioner handled both (1) the development of raw land to the point of platting and improving the lots for building, and (2) the actual construction of houses on the lots for sale to the ultimate consumers. Petitioner's marketing plan was limited exclusively to the sale of individual lots on which it had constructed homes. Petitioner did not sell, nor did it offer to sell, lots as groups to other developers or builders, and it did not sell individual platted lots without houses.

In the late 1970's, a housing slump occurred as part of the general economic recession, and sales of the lots in question came to a standstill. No lots were sold from 1980 to 1982. In 1983, eight lots were sold; thirteen others were improved with basements. Assessing the property at fifty percent of its true cash value, the township assessment for each lot was $6,400 for the years 1981 and 1982, and $6,900 for the years 1983 and 1984. Petitioner appealed the assessments to the Michigan Tax Tribunal.

On March 26, 1985, a hearing was held before a tribunal hearing officer. Each side called an ap-

praiser as a witness. The true cash value of the
properties per lot as claimed by the parties is set
forth in the following table:

| YEAR | PETITIONER | TOWNSHIP |
|------|-----------|----------|
| 1981 | $10,000 | $14,500 |
| 1982 | 9,000 | 13,000 |
| 1983 | 8,100 | 11,700 |
| 1984 | 7,800 | 13,000[1] |

The difference in the claimed true cash values
for each lot resulted from the fact that each of the
appraisers used a different valuation method. Al-
though both appraisers valued the lots as though
all of the lots were of equal value (or used an
average value per lot), the petitioner's appraiser
concluded that no market existed for individual lot
sales and therefore based the property's value on
comparable multilot sales to builders. Given the
depressed market, it was petitioner's position be-
fore the hearing officer that the buyer of the lots
would most likely be another developer or a
builder who would buy the lots "en masse," to
resell them to individuals at a profit. Petitioner
contended that a quantity or wholesale discount—
reflecting holding costs for marketing, financing,
and risk—necessarily had to be recognized as an
integral part of a group sales transaction. Under
the approach advocated by the petitioner's ap-
praiser in valuing the lots for the years 1981 to
1983, the discounted value of the lots as a group
was determined, and then the true cash value of
each lot was to be fixed for tax purposes by divid-
ing the discounted value by one hundred.

On the other hand, the township's appraiser
valued the lots by comparing sales of individual

---

[1] Eight lots which were sold in 1983 are not included in the 1984
calculation.

lots. The township contended that the true cash value of each lot was equal to the price that an individual buyer would pay for the lot, i.e., its single lot value. The township argued that its position is strengthened because the petitioner's marketing plan did not contemplate sales on a group basis; rather, the petitioner sold, and planned to sell, the lots one at a time, and then only after it had constructed houses on the lots.

The hearing officer concluded that

> on the facts herein, where petitioner declines to sell lots either individually or in groups, but only sells a lot in conjunction with the sale of a house, it seems to be a self-imposed limitation or restriction on the alienability of its property such that valuing the lots as a group might be inappropriate.

The hearing officer set the true cash value of the lots at $14,000 per lot in 1981, $13,000 in 1982 and 1984 ($15,000 in 1984 for the thirteen lots with basements), and $12,000 in 1983.

Petitioner then appealed to the entire Tax Tribunal. On March 21, 1986, the Tax Tribunal vacated the conclusions of law as stated by the hearing officer. The tribunal held:

> The Respondent [township] has convinced this Tribunal through the market approach, substantiated by a market analysis, that land is 20% of the total improved sale price, and that the subject lots, if sold *individually,* should be valued as follows: 1981, $14,500; 1982, $13,000; 1983, $11,700; and 1984, $13,000. [Emphasis in original.]

However, while adopting the township's approach to determining the individual valuation per lot, the tribunal discounted the value per lot by a factor of eighteen percent, stating:

The appraiser must distinguish between the aggregate of individual retail lot prices, and the discounted or wholesale value, which is market value. In comparing Petitioner's sales of *multiple* lots with Respondent's sales of *individual* lots; there is a distinct indication that 18% is the "mark up" difference between the purchase of multiple lots and single lots. In a sense, the typical land developer is a merchant who depends on a cost mark-up sufficient to cover expenses and produce a reasonable profit as a reward for risk and effort. This provision for profit may be expressed in a variety of ways, but should be sufficient to attract the necessary capital to the project.

* * *

This Tribunal has discounted these "retail" individual values to allow an 18% mark up for the influence of development costs during the holding period of liquidation. Realistically, if the developer sold all the subject lots at the time periods under consideration, he obviously would have sold them as an entire package and the sale price would have been at "wholesale" to allow the buyer a profit when reselling individually. [Emphasis in original.]

The Tax Tribunal concluded that the true cash value of the lots was as follows:

| 1981 | $12,300 . . . |
| 1982 | 11,000 . . . |
| 1983 | 9,900 . . . |
| 1984 | 11,000 [79 lots] . . . |
| | 13,000 [13 lots with basements] . . . |

Upon further appeal, the Michigan Court of Appeals agreed that the Tax Tribunal had properly selected the market approach as the most accurate method of valuation. *Edward Rose Bldg Co v Independence Twp,* 164 Mich App 324, 328; 416 NW2d 433 (1987). However, the Court disagreed with the tribunal's use of a discount:

Although we do not agree that petitioner's marketing decision constitutes a limit on "alienation," we do find that his marketing decision had a significant effect on what can properly be considered fair market value. Petitioner marketed only individual lots and only with a house petitioner built. On its own terms, the lots are unavailable for group-lot sales. The term "fair market value" presumes a market. Petitioner may not fairly argue that its property's value is comparable to other group-lot sales when petitioner specifically refuses to sell on that basis. The Tax Tribunal is bound to review the actual facts in a case and not possible or hypothetical sales in evaluating TCV [true cash value]. Cf. *Uniroyal v Allen Park,* 138 Mich App 156; 360 NW2d 156 (1984) (where it was held that, in determining the TCV by a capitalization of income method, the Tax Tribunal should rely on the actual rent established by lease and not a hypothetical market rent).

While petitioner does not sell individual lots without houses it builds, individual lot sales are a significantly more accurate way of measuring the TCV of petitioner's property. The Tax Tribunal is charged with the duty of accepting the approach which provides the most accurate valuation under the circumstances of each case. *Antisdale [v City of Galesburg,* 420 Mich 265, 277; 362 NW2d 632 (1984)]. We therefore find that the Tax Tribunal erred in interpreting the statutory phrase "true cash value" when it measured the fair market value of petitioner's property on a "wholesale" basis where petitioner did not, in fact, market the property in that fashion. [*Id.,* pp 329-330.]

The Court of Appeals further noted that "were we to uphold the Tax Tribunal's ruling, it would have the unhappy effect of distinguishing assessments merely on the basis of the extent of the taxpayer's holdings. . . . [T]his strikes us as fundamentally unfair." *Id.,* p 330. The Court lastly found "no relation in the record between the

assessed [true cash value] of petitioner's property and his business costs" and therefore reversed the tribunal's eighteen percent discount as error. *Id.,* p 331. The case was remanded to the tribunal for a recomputation of the ad valorem assessment consistent with the Court's opinion.

This Court granted leave to appeal.[2] 431 Mich 908 (1988).

## II

The Michigan Constitution, art 9, § 3, provides:

> The legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property not exempt by law. The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not, after January 1, 1966, exceed 50 percent; and for a system of equalization of assessments. The legislature may provide for alternative means of taxation of designated real and tangible personal property in lieu of general ad valorem taxation. Every tax other than the general ad valorem property tax shall be uniform upon the class or classes on which it operates.

---

[2] On December 29, 1988, this Court granted leave to appeal "[l]imited to the issue whether the Tax Tribunal correctly determined the value of petitioner's property." However, by order dated August 14, 1989, the Court invited the parties and amicus curiae to submit supplemental briefs discussing the issues "(a) where a land developer/builder acquires a quantity of vacant lots in a subdivision at a cost per lot which is less than the amount paid by one who is not a developer/builder to purchase a single comparable lot in the same subdivision, is the value for tax assessment purposes of the developer/builder's lots to be determined on the same basis as the single lot, or on a different basis? (b) if on a different basis, to what extent, if at all, should the developer/builder's method or plan for marketing be a factor in determining such value? and (c) whether the 'discounted or wholesale' method of determining the value for tax assessment purposes of petitioner's lots as used by the Tax Tribunal is constitutional in light of the uniformity requirements of Const 1963, art 9, § 3?"

The Legislature accordingly provided a definition of "cash value" which, during the tax years in question,[3] stated in relevant part:

> As used in this act, "cash value" means the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale. . . . In determining the value the assessor shall also consider the advantages and disadvantages of location; quality of soil; zoning; existing use; present economic income of structures, including farm structures; present economic income of land if the land is being farmed or otherwise put to income producing use; quantity and value of standing timber; water power and privileges; and mines, minerals, quarries, or other valuable deposits known to be available in the land and their value. [MCL 211.27(1); MSA 7.27(1).]

MCL 211.27a(1); MSA 7.27(1)(1) further requires that "property shall be assessed at 50% of its true cash value pursuant to section 3 of article 9 of the state constitution of 1963."

As this Court has frequently recognized in the past, our review of property tax assessment appeals is tempered by a constitutionally mandated standard of review:

> In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation. [Const 1963, art 6, § 28.]

It is the province of the Tax Tribunal to apply its expertise to the facts of each case to determine

---

[3] The statute was amended by 1985 PA 200. The amendments do not pertain to the issue at hand.

the appropriate method of arriving at the cash value, or fair market value, of the subject property. The factual findings of the tribunal are final, provided they are supported by competent and substantial evidence. *Antisdale v City of Galesburg, supra,* p 277. See also *Continental Cablevision v Roseville,* 430 Mich 727, 735; 425 NW2d 53 (1988); *Fisher-New Center Co v State Tax Comm (On Rehearing),* 381 Mich 713; 167 NW2d 263 (1969).

Despite this deferential standard of review, we conclude under the present circumstance that the Tax Tribunal adopted a wrong principle in discounting the individual lot values by a factor of eighteen percent. The tribunal's valuation of petitioner's property utilizing a wholesale discount was an improper method of valuation which distorted the fair market value of the property.

### III

As a general rule, different parcels of land in the same ownership are to be regarded as separate units for tax purposes and, as such, must be separately valued and assessed. 72 Am Jur 2d, State and Local Taxation, § 743, p 72. See generally, anno: *Different parts or parcels of land in the same unit or separate units for tax assessment purposes,* 133 ALR 524.[4]

On the basis of testimony taken before the hearing officer, the Tax Tribunal rejected the petitioner's proffered evidence of valuation based upon group lot sales comparables. Instead, the tribunal expressly accepted the valuations of the township

[4] Two sections of the General Property Tax Act allow the assessment of multiple lots as a single parcel under limited circumstances. See MCL 211.24; MSA 7.24, MCL 211.25(1)(e); MSA 7.25(1)(e). However, the township's assessor was not required by the present circumstances to assess the individual tax lots as a single parcel.

per lot (see section i). The values assigned to the individual lots as determined by the Tax Tribunal are not challenged on appeal, and we do not quarrel with this factual determination or the Tax Tribunal's selection of the market approach data produced by the township as the most accurate means of determining the true cash value of the property.

However, the Tax Tribunal inappropriately proceeded one step further. The tribunal discounted the valuations per lot "to allow an 18% mark up for the influence of development costs during the holding period of liquidation." Thus, the Tax Tribunal essentially took the "wholesale" approach, adopting the township's assessment, less eighteen percent. This application of a wholesale discount disregards several factors essential to an accurate computation of true cash value.

"Highest and best use" is a concept fundamental to the determination of true cash value. It recognizes that the use to which a prospective buyer would put the property will influence the price which the buyer would be willing to pay. Land is appropriately valued "as if available for development to its highest and best use, that most likely legal use which will yield the highest present worth." 1 Michigan State Tax Commission, Assessor's Manual, ch VI, p 5 (1972). See also *Teledyne Continental Motors v Muskegon Twp,* 163 Mich App 188; 413 NW2d 700 (1987), lv den 429 Mich 889 (1987), *The Dictionary of Real Estate Appraisal* (Chicago: American Institute of Real Estate Appraisers, 1984), p 152, and Boyce, *Real Estate Appraisal Terminology* (Cambridge, Mass: Ballinger Publishing Co, 1975), p 107.

In this case, the parties' experts agree that the highest and best physical use of the property is as single family residential lots for development into

home sites. Indeed, all of the appraisals submitted by the experts presume the use of the property as a single-family residential subdivision. The application of a wholesale discount may be appropriate when measuring the investment value of raw land or unimproved subdivision lots, but not when measuring the value of improved property if put to its highest and best use. This point was recognized in *First Interstate Bank of Oregon v Dep't of Revenue,* 306 Or 450; 760 P2d 880 (1988). In *First Interstate,* the Oregon Supreme Court considered the assessment of lots in a fully developed subdivision containing roads and utilities. The assessor valued and assessed each lot separately. The developer/owner argued for assessment of the lots as a single property, which would have resulted in a lower assessed value. Like the petitioner in this case, the developer asserted that a discount should be figured into the assessed value. Holding that the lots were to be individually assessed, the court explained,

> Taxpayer's position is based on an appraisal of the properties that relies on a "developer's discount" to arrive at the assessed value of the properties.
>
> *  *  *
>
> Reduction by this method results in a determination of the properties' value to the current owner or their value as an investment. This is not the market value, which is the price that each property would receive on the open market. OAR 150-308.205(A)(1)(a). While in certain circumstances the value to the owner might equal the market value, the value to the owner cannot be equated with the market value.
>
> There is no dispute that the highest and best use of each lot is for the construction of a single-family residence. Only by valuing the property at its highest and best use can the true cash value of a

property be determined. [Citation omitted.] *The developer's discount does not assess the value of the properties if put to their highest and best use, but reduces their value to arrive at the value of the properties considered as an investment. Investment is not the highest and best use of the properties.*

\* \* \*

Although we reject a developer's discount in the situation in which the original holding has been subdivided into several lots and the subdivision has been fully developed, it is appropriate to take into account the present legal and physical status of the property. Even if the best use of a property would be for subdivision, the property's present value would take into account the fact that the property would not be presently usable for the sale of individual lots. *However, when the property has been subdivided and roads and utilities provided to each lot, there are no longer development costs which would affect the present market value of each lot. Each lot is fully developed and ready to be put to its highest and best use. [First Interstate, supra,* pp 453-455. Emphasis added. Cf. *Appeal of Sawmill Brook Development Co,* 129 NH 410; 529 A2d 902 (1987); *Cigolini Associates v Borough of Fairview,* 208 NJ Super 654; 506 A2d 811 (1986).]

In the present analogous circumstances, it similarly cannot be said that the investment value to the petitioner bears a relationship to the fair market value of the improved property when put to its highest and best use. A discount may be appropriate where an undeveloped tract of land exists without improvements. The recognized "developmental approach" to valuation allows for such a discount. However, this approach is appropriate only in instances involving unimproved property. The Michigan State Tax Commission, Assessor's Manual, ch VI, p 7, characterizes the "developmental approach" as follows:

Land with a potential use for subdivision is often valued by the development method. . . . To indicate present value, the development method requires estimates of the selling price of developed lots; of the cost required for development, financing, carrying, and sales; of the period necessary to sell the developed lots; and of the amount by which the net sale price must be discounted.

Significantly, the Tax Tribunal rejected use of the developmental approach in the instant case, finding that it *"is not applicable to the subject property since the costs of converting the raw land into platted lots has been completed."* (Emphasis added.) The tribunal nevertheless applied a developer's discount to the market values substantiated by the township. This was error.

When the assessment of separate "improved" lots[5] is based upon sales of comparable lots using the market approach to valuation, as is the case here, market conditions are already taken into account. If the developer then obtains a further "discount" due to the same market conditions, the true cash value of each lot would be distorted. In effect, the weakness of the market would be counted twice in computing value. As explained by this Court in *Antisdale, supra,* quoting from the Michigan State Tax Commission, Assessor's Manual:

"The market value of a given property is esti-

[5] "Improved" property has been defined as "[l]and which has been prepared for development as distinguished from raw land. This implies such things as grading, draining, and installation of utilities or access." Boyce, *Real Estate Appraisal Terminology, supra,* p 112. See also *First Interstate Bank v Dep't of Revenue, supra.*

The petitioner's subdivision lots are certainly "improved" within the meaning of these definitions. Asphalt surfaced streets, curbs and gutters, storm and sanitary sewers, public water, and underground electrical and telephone service had all been installed in preparation for actual home construction on the parcels.

mated by comparison with similar properties
which have recently been sold or offered for sale in
the open market. The principle of substitution is
applied, i.e., when property is replaceable, typical
buyers will not purchase it at a higher price than
those paid for similar properties with comparable
locations, characteristics, and future earning capa-
bilities. Of all appraisal methods the market data
approach is the most direct, the best understood,
and *the only one directly reflecting the balance of
supply and demand for a whole property in actual
market place trading.*" [*Antisdale, supra,* p 276, n
1, quoting 1 Michigan State Tax Comm, Assessor's
Manual, ch VI, pp 1-2. Emphasis added.]

In *St Leonard Shores Joint Venture v Sup'r of
Assessments of Calvert Co,* 307 Md 441, 445; 514
A2d 1215 (1986), the court considered a challenge
by a land developer to the property tax assessment
of a subdivided tract of land owned by him. The
developer argued that the assessment should have
taken into account a discount for the length of
time necessary to sell all of the lots. The super-
visor's assessment valued each of the lots using
comparable individual lot sales in the taxpayer's
and in neighboring subdivisions. The court af-
firmed that assessment, stating:

Regardless of whether a buyer for each lot actu-
ally exists, the assessor is required to assess each
lot as if a willing buyer exists. This is not to say
that a glut on the market should not be consid-
ered. We think, however, that the condition of the
real estate market is adequately reflected in the
price that the hypothetical buyer would be willing
to pay. Therefore, we reject appellant's contention
relating to the "sell-out period" of the lots.

\* \* \*

We think that these sales, as well as the sales in
similar subdivisions, provided an ample basis from
which the Tax Court could reasonably conclude

that the Supervisor had correctly assessed the
subdivision lots. . . . "[Appellant's] approach to
fair market value is a staged sell-out over a period
of years, with [appropriate] conveying charges etc.,
and finally reducing the end result to a net profit
figure. This is good, sound business practice. Un-
fortunately, it is not the way the assessment pro-
cess works." [*Id.*, pp 446-448.]

In the instant case, there may not have been
one hundred buyers for the one hundred subdivi-
sion lots. However, this fact is not determinative
of value; current market conditions are an intrin-
sic element of the market data approach.

It has also been recognized that the calculation
of a discount for absorption time would be unduly
speculative: " 'If all the lots sold in one year, we
have a value certain; if all the lots sell over a
period of years, we have a value dependent upon
the future whims of the market place.' " *St Leo-
nard Shores Joint Venture v Sup'r of Assessments
of Calvert Co,* 61 Md App 204, 207; 486 A2d 206
(1985), aff'd 307 Md 441; 514 A2d 1215 (1986).

Finally, the statutory definition of true cash
value—"the usual selling price"—requires that
actual facts be a significant consideration in the
valuation of property. We have previously recog-
nized that

> [t]here are many factors external to property that
> influence and determine its real value; they in-
> clude neighborhood conditions, location, property
> tax, general economic conditions, and the cost of
> borrowing. [*Washtenaw Co v State Tax Comm,* 422
> Mich 346, 366; 373 NW2d 697 (1985). See also
> *Antisdale, supra,* p 285 ("To the extent that tax
> benefits to a typical owner affect the 'usual selling
> price' of property, they are properly included
> within the true cash value of the property"); MCL
> 211.27; MSA 7.27.]

Even the dissent in the instant case realizes that " 'Assessment decisions must recognize limitations or restrictions which have a bearing on the selling price of property.' " (Opinion of Levin, J., *post,* p 668.) In the instant case, the petitioner's marketing scheme affected the fair market value of the property. As the Court of Appeals aptly noted,

> Petitioner marketed only individual lots and only with a house petitioner built. On its own terms, the lots are unavailable for group-lot sales. The term "fair market value" presumes a market. Petitioner may not fairly argue that its property's value is comparable to other group-lot sales when petitioner specifically refuses to sell on that basis. [164 Mich App 329.]

It is the duty of the Tax Tribunal to accept the approach which provides the most accurate valuation under the circumstances of each case. *Antisdale, supra,* p 277. While the tribunal properly selected the market approach, based on individual lot sales, as the most accurate way of measuring the true cash value of petitioner's property, the application of a discount to the valuations per lot contradicted this market approach and was inconsistent with the recognized highest and best use of the property. We therefore conclude that the Tax Tribunal adopted wrong principles in measuring "true cash value" under the present circumstances.

IV

One final aspect of this case warrants our attention. The township contends that assessments that would be derived from using two different markets —a multilot market for the unsold lots and a single lot market for the sold lots—for property

identical in all respects except for ownership violates the principle of uniformity of taxation. This is a legitimate concern.

The Michigan Constitution mandates not only that property must be assessed at a uniform fifty percent of true cash value, but also that the ad valorem taxation itself be uniform. Const 1963, art 9, § 3. It is well established that the concept of uniformity requires uniformity not only in the rate of taxation, but also in the mode of assessment. *East Grand Rapids School Dist v Kent Co Tax Allocation Bd,* 415 Mich 381, 395-396; 330 NW2d 7 (1982), reh den 417 Mich 1104 (1983); *Washtenaw Co, supra; Titus v State Tax Comm,* 374 Mich 476; 132 NW2d 647 (1965); *Huron-Clinton Metropolitan Authority v Bds of Supervisors of Five Counties,* 304 Mich 328, 335-336; 8 NW2d 84 (1943). The "controlling principle is one of equal treatment of similarly situated taxpayers." *Armco Steel Corp v Dep't of Treasury,* 419 Mich 582, 592; 358 NW2d 839 (1984).

The uniformity requirement of the Michigan Constitution compels the assignment of values to property upon the basis of the true cash value of the property and not upon the basis of the manner in which it is held. Noticeably absent from the statutory definition of "cash value" and those enumerated factors which an assessor must consider is any reference to the identity of the person owning an interest in the property or whether there are other parcels which are owned by the same taxpayer. MCL 211.27; MSA 7.27. In other words, the fact of ownership is not a germane consideration in determining value:

> "The Constitution requires assessments to be made on property at its cash value. This means not only what may be put to valuable uses, but

what has a *recognizable pecuniary value inherent in itself, and not enhanced or diminished according to the person who owns or uses it."* [*Washtenaw Co, supra,* p 370, n 4, quoting *Perry v Big Rapids,* 67 Mich 146, 147; 34 NW 530 (1887). Emphasis in original.]

It matters not, accordingly, whether similar tax parcels are owned by the same person. The tribunal's mode of assessment violates the sum and substance of the uniformity mandate. As the Court of Appeals in this case recognized,

> [W]ere we to uphold the Tax Tribunal's ruling, it would have the unhappy effect of distinguishing assessments merely on the basis of the extent of the taxpayer's holdings. A large property owner, even though he is marketing individual lots and not proposing multi-lot sales, would be able to claim a significantly reduced assessment, compared to a single lot holder, merely on the basis of extensive holdings. In this context, this strikes us as fundamentally unfair. Const 1963, art 9, § 3. [164 Mich App 330.]

Affording a discount to the multilot owner provides advantageous treatment upon the basis of a factor unrelated to the land itself. It "would produce an inherent preference in favor of developers, as opposed to taxpayers who own single or scattered lots." *St Leonard Shores Joint Venture, supra,* 61 Md App 215. Two identical lots, available for the same ultimate use, would not be equally taxed. And, practically speaking, the taxing authority would be faced with the problem of where to draw the line—should a discount be allowed for a twenty-lot owner, a fifty-lot owner, or only the one hundred-lot developer?

We conclude that the disparity in treatment which results from the tribunal's method of valua-

tion is not permissible under the uniformity provisions of the Michigan Constitution.

CONCLUSION

The Tax Tribunal adopted wrong principles in this case when it utilized a wholesale discount in determining the true cash value of petitioner's improved subdivision lots. There was ample market data produced by the township regarding individual lot sales which provided an accurate means of ascertaining the true cash value of individual lots. In fact, the tribunal expressly accepted the valuations per lot proposed by the township. The tribunal nevertheless proceeded to apply a wholesale discount to these values. This was error.

We do not preclude the possibility that a wholesale discount may be an appropriate element of valuation where the subject property is raw or unimproved land and the land is suitable for valuation using the developmental approach. However, where, as here, the land has been subdivided and improved, the petitioner has chosen to market the property on an individual lot basis only, and the market approach constitutes the chosen means of measuring values per lot, a developer's discount distorts the true cash value of the lots. In effect, it doubly counts the weakness of the market and allows for costs to the developer which are no longer relevant given the "improved" status of the property.

In light of our holding, we affirm, as did the Court of Appeals, the tribunal's findings as to the individual lot valuations without the application of a discount.

We remand this case to the Tax Tribunal for a

computation of the tax for the years in question consistent with this opinion.

RILEY, C.J., and BRICKLEY, CAVANAGH, BOYLE, and ARCHER, JJ., concurred with GRIFFIN, J.

LEVIN, J. (*to reverse the Court of Appeals and affirm the Tax Tribunal*). Edward Rose Building Company owned one hundred single family residence lots that it had platted and improved with utilities and roads. The Tax Tribunal, on Rose's petition for review of real property tax assessments,[1] found that, for the tax years 1981 through 1984, the wholesale values of the lots were approximately $2,000 a lot less than the retail values of the lots,[2] and directed that the assessments be revised on the basis of the wholesale values.

The Court of Appeals reversed,[3] stating that the Tax Tribunal had erred as a matter of law.[4]

I

The constitution provides that a determination of the Tax Tribunal "relating to valuation" is not subject to appeal "to any court" in the "absence of fraud, error of law or the adoption of wrong princi-

---

[1] MCL 205.731, 205.735; MSA 7.650(31), 7.650(35).

[2] The Tax Tribunal found the following values:

| YEAR | RETAIL VALUE | WHOLESALE VALUE |
|------|--------------|-----------------|
| 1981 | $14,500 | $12,300 |
| 1982 | 13,000 | 11,000 |
| 1983 | 11,700 | 9,900 |
| 1984 | 13,000 | 11,000 |

Eight of the one hundred lots were sold in 1983-84. The stated 1984 wholesale value of $11,000 a lot was set for 79 lots. The remaining 13 lots, which had been improved with basements, were valued at wholesale by the Tax Tribunal at $13,000 a lot.

[3] *Edward Rose Bldg Co v Independence Twp,* 164 Mich App 324; 416 NW2d 433 (1987).

[4] See n 10 and accompanying text.

ples."[5] This Court has held, however, that a valuation not "supported by competent, material, and substantial evidence on the whole record"[6] constitutes an error of law.

The question presented is, thus, (1) whether there is competent, material, and substantial evidence on the whole record to support the "wholesale" values set forth in the decision of the Tax Tribunal, and (2) whether the Tax Tribunal, in directing that the assessments be based on the "wholesale" values, committed fraud or error of law or adopted a wrong principle.

The majority agrees with the Court of Appeals that the Tax Tribunal erred as a matter of law in measuring the "true cash value"[7]/"usual selling

---

[5] In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation. [Const 1963, art 6, § 28.]

[6] *Fisher-New Center Co v State Tax Comm (On Rehearing)*, 381 Mich 713, 715; 167 NW2d 263 (1969), adopting the view of Justice SOURIS expressed in dissent in *Fisher-New Center Co v State Tax Comm*, 380 Mich 340, 371; 157 NW2d 271 (1968), that valuation decisions of the final agency (n 5) must be supported by competent, material, and substantial evidence, and that a decision not so supported constitutes an error of law. Similarly, see *Antisdale v City of Galesburg*, 420 Mich 265, 277; 362 NW2d 632 (1984), and *Continental Cablevision v Roseville*, 430 Mich 727, 735; 425 NW2d 53 (1988).

[7] The legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property not exempt by law. The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not, after January 1, 1966, exceed 50 percent; and for a system of equalization of assessments. The legislature may provide for alternative means of taxation of designated real and tangible personal property in lieu of general ad valorem taxation. Every tax other than the general ad valorem property tax shall be uniform upon the class or classes on which it operates. [Const 1963, art 9, § 3.]

price"[8] of Rose's property on a wholesale basis.[9] The majority concludes that the Tax Tribunal was required, as a matter of law, to ignore the wholesale market and to adopt values established in the retail market as the true cash value.

The majority does not advert to the evidence of sales of residential lots in quantities to builders at wholesale prices less than retail prices. Nor does the majority conclude that the wholesale values found by the Tax Tribunal were not supported by competent, material and substantial evidence.

I would hold that there was sufficient evidence to support the wholesale values, and that, in basing the assessments on wholesale values, the Tax Tribunal neither committed fraud or error of law, nor did it adopt a wrong principle. There is, indeed, overwhelming evidence that there was a wholesale market, and that the differential between the wholesale and retail markets was greater than the "discount" allowed by the Tax Tribunal.

II

The majority relies on two of the four reasons[10] stated by the Court of Appeals, and advances

---

[8] The Legislature so provided: "As used in this act, 'cash value' means the *usual selling price* at the place where the property to which the term is applied is at the time of assessment, being the price which could be obtained for the property at private sale, and not at auction sale except as otherwise provided in this section, or at forced sale." (Emphasis added.) MCL 211.27(1); MSA 7.27(1).

[9] *Ante,* pp 624-625.

[10] The two reasons advanced by the Court of Appeals that were not relied on by the majority are:

(1) The Court of Appeals, on rehearing, "clarified" its opinion by adding that "the wholesale approach and eighteen percent reduction were not supported by the evidence";

(2) The Court of Appeals found in its original opinion, that the Tax Tribunal erred in discounting the retail value of the lots by approxi-

additional reasons, for concluding that the Tax Tribunal erred as a matter of law in basing the assessments on wholesale values.

The Court of Appeals and the majority both rule that sales on the wholesale market are to be ignored, as a matter of law, in establishing the usual selling price/true cash value because:

—The lots were *not actually offered* for sale on the wholesale market to builders.[11]

Although Rose did not offer the lots for sale in the wholesale market, the Tax Tribunal did not err in finding that *if all the subject lots* were sold, they would "realistically" and "obviously" have been *sold as an entire package* at wholesale to

---

mately $2,000 per lot, because Rose likely derived an income tax benefit from "many of the holding costs" that the Tax Tribunal had taken into consideration in allowing the discount, and the Court of Appeals could find no record support for a relationship between the value of Rose's lots and its business costs, and the Court of Appeals could not "perceive how the cost to the developer is related to the price that an arm's length buyer is willing to pay." *Id.,* p 331.

The Court of Appeals clearly erred in considering—(2) above—income tax advantages that Rose might derive from deducting real property taxes and other holding and carrying costs. While tax benefits might affect the size of the differential between the wholesale price and the retail price, the determinant of true cash value is the wholesale or retail price that a willing buyer and a willing seller would agree upon as it may be affected, or not affected, by the tax benefits to the buyer or seller.

The price actually paid—the market—cannot appropriately be ignored because buyers or sellers might have derived a tax benefit before, as a result of, or after entering into, a real estate transaction. Tax benefits are not, in the words of the Court of Appeals, "related to the price that an arm's length buyer is willing to pay." *Id.*

[11] The argument ignores that Rose not only did not offer the lots for sale at wholesale, neither did it offer the lots for sale at retail. It is one thing to say that Rose must pay real property taxes whether it chooses to hold the lots or market them. It is quite another to say that, because it chooses to hold the lots and not market them in the depressed market of the early 1980's, the lots must be valued on the basis of comparable retail sales rather than on the basis of comparable wholesale sales or a combination of both.

The Tax Tribunal viewed the matter appropriately when, although Rose had not offered the lots for sale, it saw Rose as a merchandiser of lots and looked to the price that another merchant would have paid for the lots.

allow the buyer a profit when reselling individually.

—Were the ruling of the Tax Tribunal to be affirmed, "it would have the unhappy effect of distinguishing assessments merely on the basis of the extent of the taxpayer's holdings," so that a "large property owner" would be assessed less than the owner of a single lot, and, in context, this seemed, as the Court of Appeals put it, to be "fundamentally unfair" in light of Const 1963, art 9, § 3,[12] the uniformity clause.

The argument confuses *true cash value* and *uniformity*. Uniformity concerns the proportion of true cash value at which property is assessed, constitutionally fixed at fifty percent, and not the method of valuation employed to determine true cash value.

If all property were assessed at true cash value, there would automatically be uniformity because all property would then be assessed at the same proportion, one hundred percent, of true cash value—all property would then be uniformly assessed. Lack of uniformity cannot arise from valuing property at its usual selling price/true cash value.

The statutory/constitutional standards of usual selling price/true cash value and uniformity are not contradictory, and are not in need of harmonization or reconciliation by judicial reformulations.

The additional reasons advanced by the majority are:

—The assessor was not required to assess the lots as a single parcel, and was justified in *separately valuing and assessing* them.[13]

---

[12] *Rose, supra,* p 330. See n 7 for text.
[13] *Ante,* p 632, n 4 and accompanying text.

This confuses *assessment* and *valuation*—usual selling price concerns valuation, not assessment;

—In allowing a wholesale discount for improved subdivision lots, the Tax Tribunal failed to measure the value of the "property if put to its *highest and best use.*"[14] (Emphasis added.)

This confuses *use* and *value*—usual selling price concerns valuation, not use;

—Recognizing a merchant's discount, in addition to a reduction in value to take market conditions into account, would be to *count the weakness in the market twice.*[15]

Recognizing that a merchant would only buy at a price that enables the merchant to cover expenses and hopefully realize a profit, would not count a weakness in the market twice because merchants buy low at wholesale and sell high at retail in *both good times and bad times.*

### III

I agree with the majority that Rose is not "entitled" to a land *developer's* discount for the length of time it would take to market the one hundred lots that Rose had subdivided and improved with utilities and roads.

### A

The Tax Tribunal did not err, however, in ignoring that Rose had not offered the lots for sale to other builders or to consumers. Nor did it err in finding that a land developer who had one hundred lots for sale would ordinarily and "realistically" sell them to buyer(s) at a wholesale discount from what the buyer(s) would sell them to home

---

[14] *Ante,* p 634.
[15] *Ante,* p 636.

buyers, and in concluding that in the tax years
there was a wholesale market with a "usual sell-
ing price"—the statutory definition of the constitu-
tional standard of "true cash value"—approxi-
mately $2,000 a lot less than the consumer's retail
market for the very same lots.

The Tax Tribunal saw Rose as a "merchant"
who performs the service of marketing a lot to a
consumer that *adds value*—$2,000 said the Tax
Tribunal—to the lot when, and not before, the lot
is actually so marketed to a particular consumer.
That is a value land developers, and hence the
market, recognize by their willingness to sell lots,
for less than consumers will pay, in quantities to
builders who perform that service. And that is a
value consumers recognize by their willingness to
pay more for a lot than a builder pays.

In the Oregon[16] and Maryland[17] cases relied on
by the majority, the taxpayers were land develop-
ers who claimed that their inventories of unsold
lots should be valued—on the basis of appraisals,
not comparable sales—to *yield a return* on their
investment or to take into consideration the *length
of time* necessary to sell all the lots. There was
not, as here, evidence of actual sales of quantities
of lots to builders, or of a differential between the
usual selling price of a quantity of lots on the
wholesale builder's market and the usual selling
price of a single lot on the retail consumer's
market.[18]

In the Oregon case, the Oregon Department of
Revenue had, on appeal from the county assessor,
reduced the assessment of the thirty-two lots and

[16] *First Interstate Bank of Oregon v Dep't of Revenue,* 306 Or 450;
760 P2d 880 (1988), aff'd 10 Or Tax 452 (1987).

[17] *Sup'r of Assessments of Calvert Co v St Leonard Shores Joint
Venture,* 61 Md App 204, 215; 486 A2d 206 (1984), aff'd 307 Md 441;
514 A2d 1215 (1986).

[18] See part IV.

other parcels and determined that their value should be established by ascertaining the difference between the sales prices of comparable lots *"sold as a group"* and the total amount the lots would have sold for if sold individually, and by applying the percentage of difference as a discount in determining the value of the property—*that is the method adopted by the Tax Tribunal in this case.*

The Oregon Supreme Court held that the developer was not entitled to a *further* discount determined on the basis of the time required to sell all the lots individually. The developer's assessment was finalized on the basis of the wholesale price of comparable lots sold as a group, a discount of over $3,000 a lot.[19]

B

The record *in this case* establishes that there were two usual selling prices[20] of lots—the wholesale usual selling price to builders, and the retail usual selling price to consumers. The concepts of usual selling price/true cash value do not require or permit the Tax Tribunal to ignore, *as a matter of law,* relevant and material evidence of a fact bearing on the determination of usual selling price/true cash value: the usual selling price of a quantity of lots to builders.

The majority states: "[T]he statutory definition of true cash value—'the usual selling price'—

[19] The wholesale value was $9,100 a lot. Accordingly, the differential between the wholesale value of a lot and the retail value allowed in the Oregon case was greater than that allowed by the Tax Tribunal in this case.

I acknowledge that language and analysis in the Oregon case criticizes the view of the Oregon Department of Revenue and supports the view of the majority.

[20] See part IV.

*requires that actual facts* be a significant consideration in the valuation of property."[21] (Emphasis added.) Yet the majority concludes as a matter of law that the "actual facts," found by the Tax Tribunal, must be ignored, and that the usual selling price/true cash value may not, as a matter of law, be based on evidence of the usual selling price of a quantity of lots to builders. Rather, the usual selling price, must, again as a matter of law, be based on sales in what is generally, when market conditions are normal, a secondary market[22] where lots are sold at retail to potential home buyers.

C

The majority asserts that "the petitioner's marketing scheme affected the fair market value of the property," and argues that Rose may not " 'fairly argue that its property's value is comparable to other group-lot sales when petitioner specifically refuses to sell on that basis.' "[23]

---

[21] *Ante,* p 638.

[22] The Tax Tribunal's opinion and judgment does not provide as detailed findings of fact as might be desirable. It is clear, however, on reading the record, that with the exception of one subdivision, where a relatively small number of lots were developed for sale to consumers who would themselves engage the services of custom home builders, all the lots in the comparable subdivisions that both appraisers identified had been developed for sales by the land developers to builders. The builders would then build model homes and sell packages of lot and home to consumers.

During the real estate recession in the early 1980's, builders could not sell homes because interest rates were running well over twelve percent. The record indicates that the only consumers in the market were those who could pay for a lot within a year and who had the financial credit that would enable them to engage the services of a custom home builder. The record also indicates that it is questionable whether a custom home buyer would have been interested in a lot in a production home subdivision like the Rose subdivision developed with, as described by one of the appraisers "cookie-cutter-type homes with maybe 4 different styles."

[23] *Ante,* p 639, quoting with approval the opinion of the Court of Appeals. *Rose, supra,* p 329.

Rose's "marketing scheme" had no affect on the market value of the one hundred lots. Market value is determined by what buyers desiring to buy will pay, and sellers desiring to sell will accept, and is not affected by the willingness of a particular owner to sell.

Most property, whether homes or commercial property, is only infrequently on the market, and generally is not offered for sale in a particular tax year. Property not on the market must nevertheless be valued for ad valorem taxation at its usual selling price.

The question is the sum(s) of money Rose's lots would have sold for if Rose had offered them for sale. Unless Rose then had, or geared up, or engaged the services of a selling organization to market one hundred lots to one hundred consumers, who had the financial means and desire to pay cash for a lot in a production home subdivision, and to carry the lot and finance construction until completion of a home by a custom home builder, Rose could only have sold the lots to other builders at a wholesale market price. That is the only *market* in which one hundred lots can "realistically" be sold, as the Tax Tribunal properly found.

D

I would agree that "[i]f the developer" were to obtain "a further 'discount' due to the same market conditions, the true cash value of each lot would be distorted," and then "the weakness of the market would be counted twice in computing value."[24] But there is a big "if" in that argument, one for which there is no support in the record and which is contradicted by the record.

To be sure, "sales of comparable lots," the mar-

[24] *Ante*, p 636.

ket approach to valuation, takes into account
"market conditions." If, again, one views the dis-
count allowed by the Tax Tribunal as a "develop-
er's discount" for the time it would take to sell the
lots due to adverse market conditions—the kind of
discount sought by the developer in the Oregon
case—then to allow a discount to the developer, for
the time it takes to sell the lots due to adverse
market conditions, could be duplicative of the
reduction in the retail value, based on comparable
retail sales, of the lots due to adverse market
conditions.

The Tax Tribunal, did not, however, allow a
"developer's" discount to take into account adverse
market conditions. It rejected the developmental
approach to valuation, but nevertheless allowed a
merchant's discount in valuing Rose's lots based
on record evidence that there "is a distinct indica-
tion that 18% is the 'mark up' difference between
the purchase of multiple lots and single lots," and
that this differential enables "the *merchant*" to
"cover expenses and produce a reasonable profit as
a reward for risk and effort."

While the Tax Tribunal spoke of a "holding
period of liquidation," it is apparent that it did not
allow the "mark-up" because of market condi-
tions.[25] It recognized, rather, that a *merchant* re-
quires a markup to cover expenses incurred and
for services rendered in marketing a product,
whether market conditions are poor, indifferent, or
tremendous.

---

[25] The Tax Tribunal accepted, as a point of beginning in its valua-
tion, the township appraiser's retail values that were based on compa-
rable retail sales, but nevertheless "discounted" the retail values to
provide a merchant's markup for a bulk sales buyer in an amount
less than the differential between wholesale and retail prices that the
township's appraiser testified would constitute a normal markup.

The township's appraiser testified that the reduction in the retail
values in the tax years 1981-1984 (see n 2) was based on *comparable
retail sales.* Accordingly, the reduction in retail values did not reflect
an allowance for a *merchant's* holding or carrying costs.

There is no evidence that weakness in the market would be counted twice were a builder/merchant wholesale market discount, applicable in normal as well as abnormal marketing times, recognized as a fact, and not brushed aside on the bases of hypotheses unsupported in the record and controverted by experience, and of legal reformulations that substitute "highest and best use," separate "assessment," and "uniformity" for usual selling price/true cash value, the statutory and constitutional standards.

### E

The majority, on the basis of scattered sales in a secondary market in an abnormal marketing time, has announced a rule of law for valuing inventories of lots held by land developers or builders that, henceforth, may be thought to be applicable when normal marketing conditions prevail and there is abundant evidence of a thriving primary builder's market and that land developers generally sell lots at wholesale price in that market.

### IV

The township's appraiser, James M. Fuller, provided evidence that there was a wholesale market and that the differential between the wholesale market price for a comparable lot and the retail market price was greater than the differential—an eighteen percent "mark-up" or "discount"—allowed by the Tax Tribunal.

Fuller testified that retail sales of comparable residential lots in Woodglen Estates Subdivision and other subdivisions supported the retail values he ascribed to the Rose lots. He also testified, however, that immediately following the develop-

ment of the Woodglen lots with utilities and roads, thirty-six of the thirty-seven Woodglen lots had been sold to two builders at the wholesale price of $17,500 a lot.[26] He said that the builders had been able to sell eighteen lots with houses before the onset of the real estate recession in the early 1980's. Further, that the "contributing" or "retail" value of the lots in "package sales" of lot and house to consumers was $23,500 a lot. He also testified that when the thirty-six lots were sold to the builders, one lot was sold to an individual "at $22,500 which would tend to support that general area being the retail value."

Accordingly, Fuller, the township's appraiser,

---

[26] Fuller relied in part on thirty "retail" sales, from September, 1982, through November, 1984, of lots in Woodglen Estates Subdivision. He testified that Woodglen was subdivided in two phases. The first phase was thirty-seven lots. He said that "36 of the lots were sold to 2 builders immediately upon completion of the development. The price is at $17,500." In response to a question from the township's lawyer whether these "were wholesale prices" he said, "I would say yes. They probably were." He said that eighteen lots "were sold in conjunction with building jobs" by the two builders, and "[r]eportedly the contributive value of the sites included with the building jobs at that time was $23,500." The township's lawyer inquired whether $23,500 was "the retail value of the lots," and Mr. Fuller responded "[t]hat's right."

Mr. Fuller further testified that the two builders returned eighteen of the thirty-six lots they had purchased to the developers in early 1982 because they were no longer, because of high interest rates and other adverse marketing conditions, able to construct homes on the lots and market them to consumers. At the same time, phase two of Woodglen came on the market with an additional thirty-one lots, so that there were forty-nine lots to be marketed.

Fuller's written appraisal indicates that in February, 1983, two lots were sold to a builder or builders for $15,000 each, and that two lots were sold in January-February for $18,000 each, and two lots were sold in March-April for $20,000 each. This further evidences that developers sell to builders at a lower price than they sell at retail to consumers.

Fuller also testified that the builder who purchased sixty-four lots in Watkins Hills No. 9 Subdivision from a bank following foreclosure at $9,000 a lot did not "put them in at $9,400" a lot in the building packages the builder was attempting to sell, but rather "at prices ranging from $13-$15 [presumably 000] or more." That indicates a "discount" ranging between 27.6 percent to 37.3 percent from the retail price of $13,000 to $15,000 to the wholesale price of $9,400.

provided competent, material and substantial evidence on the whole record that:

—the lots in Woodglen, with the exception of one lot, were originally sold to builders, and, hence, record support that there is a builder's market distinct from the consumer's market, and for the finding by the Tax Tribunal that a sale of a quantity of as many as one hundred lots would have been as "an entire package,"[27] and that

—sales in that market and in that quantity are at wholesale prices, not at retail prices, even though the developer may be able to sell one lot to a consumer at a retail price, and for the finding by the Tax Tribunal that "the sale price would have been at 'wholesale,' "[28] and that

—the differential between the wholesale price to builders, $17,500, and the retail price to consumers, $22,500/$23,500, is $5,000/$6,000, or a "discount" from retail to wholesale of between 22.2 percent and 25.5 percent, and for the finding by the Tax Tribunal that "[i]n comparing [Rose's evidence of comparable] sales of *multiple* lots with [the township's evidence of comparable] sales of *individual* lots; there is a distinct indication that 18% is the 'mark up' difference between the purchase of multiple lots and single lots." (Emphasis in original.)[29]

---

[27] The Tax Tribunal said:

> Realistically, if the developer sold all the subject lots at the time periods under consideration, he obviously would have sold them as an entire package and the sale price would have been at "wholesale" to allow the buyer a profit when reselling individually.

[28] *Id.*

[29] The Tax Tribunal translated the eighteen percent markup into a discount from the retail market value to the wholesale market value of approximately $2,000 per lot, between 15.1 percent and 15.3 percent, for the four tax years.

Fuller did not assert that there was not a wholesale market, or that retail prices should be determinative of true cash value. He said that he had been instructed by the township's attorney to ignore sales of quantities of lots and to appraise the lots on a retail basis by looking only at individual lot sales as comparables. When asked whether, and to what extent, wholesale or retail market prices should be determinative of true cash value, he demurred that the question was one of law.

Fuller provided further evidence that subdivision lots are sold to builders at wholesale prices less than the retail prices at which they are sold to consumers, when he testified that he doubted that a prudent purchaser could have been found who would have paid one hundred times the retail values to which he testified for the one hundred lots.[30]

Fuller said that a "buyer of all these lots" is going to have to handle the cost of holding the lots for a certain holding period, and therefore "must"

---

[30] Fuller testified that he doubted whether a purchaser could have been found who would have paid $1,450,000 cash for the one hundred lots on December 31, 1980, even though he testified that the lots should be valued at retail at $14,500 each as of that date.

He also testified that he doubted that a prudent purchaser would have paid $1,300,000 cash for one hundred lots on December 31, 1981, or $13,000 a lot, the retail value he placed on the lots as of a year later as the real estate recession deepened.

He further doubted whether a prudent purchaser would have paid $1,170,000 cash for one hundred lots, on December 31, 1982, or $11,700 a lot, the retail value he placed on the lots as of still another year later as the real estate recession further deepened.

He agreed that it was no more likely that a purchaser could have been found who would have paid $1,300,000 cash for one hundred lots on December 31, 1983, $13,000 a lot, the retail value he placed on the lots, than that a purchaser could have been found, on December 31, 1980, at the onset of the real estate recession, who would have paid $1,450,000 cash for one hundred lots. The increase from $11,700 a lot to $13,000 a lot from December 31, 1982 to December 31, 1983 reflects a turnaround in 1983 as interest rates for home mortgages moved lower.

buy them, if he is not going to lose money, for less than the retail price a lot.[31]

Fuller also testified that a $4,000 differential between a wholesale price to a builder of $19,000 a lot and a retail price of $23,000 a lot to the consumer would be a "normal builder's mark-up" where a builder buys a lot and pays interest to the developer on the unpaid purchase price.

Fuller thereby provided further competent, material and substantial evidence on the whole record for the finding of the Tax Tribunal that "[i]n a sense, the typical land developer is a *merchant* who depends on a cost mark-up sufficient to cover expenses and produce a reasonable profit as a reward for risk and effort. This provision for profit may be expressed in a variety of ways, but should be sufficient to attract the necessary capital to the project." (Emphasis added.)

Fuller's testimony regarding the wholesale market,[32] that a buyer of one hundred lots would pay less a lot than the retail prices, and that a "normal builder's mark-up" would be $4,000—where the retail price is $23,000, the price to the builder would normally be $19,000—supports the Tax Tribunal's conclusion that the wholesale value of one hundred lots would be $2,000 a lot less than the

[31] Fuller at first testified that it was possible that a prudent purchaser would have paid $1,300,000, or $13,000 a lot as of December 31, 1983. He acknowledged on further cross-examination that his first answer was a "bad answer" after he was asked whether he had taken into consideration interest on the investment, taxes, the potential for loss, and possible profit.

He added that "there is definitely a difference" between the retail value he had stated and "the value on a bulk sale basis," and that the bulk sale value would be less than the value he stated.

[32] Fuller's testimony, providing evidence of a wholesale market, does not mean, of course, that there was not a retail market. On the contrary, the thrust of Fuller's testimony was that there was a retail market, and that the comparable sales to which he testified were evidence of the market value in that market.

retail values to which Fuller testified, retail values adopted by the Tax Tribunal, of between $11,700 and $14,500 a lot in the tax years.

V

As any product, be it a widget or a parcel of land, moves along a chain of production from owner to owner, value is added to the product without regard to whether the product is changed.[33] That addition of value is reflected in a higher price for the product; this is the conception on which the value-added tax rests.

At each step along the chain of production, value is added to the product, the price of the product increases, and the product is sold into a new market. The value of the product to the owner at any point along the chain of production is *in part a function of the market into which the product will be sold.* Bonbright illustrates:

> Suppose that an appraiser is called upon to find the market value of fifty shirts, Manhattan brand, in New York City on June 1, 1931. The shirts are turned over to him so that he may observe their style, quality, and condition, but no further information is given him, save for the instruction that he must observe the definitions of market value given in the current textbooks on economics.
>
> The appraiser would have to reply that the question is unanswerable in its present form. For no statement has been made as to whether market value means the price for which the shirts could be sold by their manufacturer, by a dry-goods wholesaler, by a retail haberdasher, or by a retail customer. Yet these price differences are so great

---

[33] The value of agricultural products increases as they move from the farmer to the supermarket. This is so even though the products do not undergo significant change during this succession.

that one price may be several times another price.[34]

Bonbright concludes,

*"The power of a commodity to command a price"* *depends, not alone on the commodity, but also on the market for that commodity commanded by the owner. . . .*[35] [Emphasis added.]

"Misled by the mathematical postulate, applied to spatial relationships, that 'the whole is equal to the sum of its parts,' "[36] one may "falsely infer[ ] that the *value* of an economic whole is equal to the sum of the *values* of the parts."[37] (Emphasis in original.) The falsity of this assumption may be illustrated in a number of contexts. The value of a business may be more or less than the sum of the liquidation values of the separate business assets. The value of a block of stock may be more or less than the sum of the value of the individual shares.[38] Bonbright wrote:

---

[34] 1 Bonbright, Valuation of Property, p 51.

[35] *Id.*

[36] *Id.*, p 77.

[37] *Id.*

[38] Bonbright illustrates:

For example, the price at which an investment trust could sell 100,000 shares of a particular stock which it holds in its portfolio, even with due allowances for a reasonable time within which the liquidation must take place, might well be far less than the imputed value [the value calculated by multiplying the value of a single share by the number of shares] of that stock based on current quotations of 100-share lots. [*Id.*, p 57.]

A large block of common stock may sell for less than the price indicated by sales of smaller quantities. Bonbright, writing in 1937, said that the weight of authority is against allowing for blockage in determining the fair market value of a large block of common stock for death-tax purposes and referred to *In re Gould's Estate,* 19 AD 352; 46 NYS 506 (1897), modified on other grounds 156 NY 423; 51 NE 287 (1898). 2 Bonbright, p 717.

Similarly, an intelligent appraiser, in valuing a large tract of land subdivided into smaller lots, would recognize the likelihood that the separate sale values of the various lots *cannot* be summed up to give the sale value of the larger whole. [Emphasis added.][39]

Everyone in the chain of production from vacant land to house occupancy adds value to the vacant land—the broker who brings the land owner and land developer together, the lawyer who assisted in formalizing the transaction, the engineer who designed the layout, the sewer, water, and road contractors, *the real estate broker who arranges a sale of lot(s) to builder(s) at a wholesale price or to consumers at a retail price,* the basement contractor, carpenters, electricians and other trades, and suppliers of materials.

VI

The Court of Appeals and the majority are concerned that recognition that there are two different markets, a wholesale market where lots are sold to builders and a retail market where lots are sold to consumers, would violate the constitutional mandate that the Legislature shall provide "for the uniform general ad valorem taxation of

A gift tax regulation, 26 CFR 25.2512-2(e), and an estate tax regulation, 26 CFR 20.2031-2(e), recognize, however, that effect should be given to "blockage" in valuing a large block of common stock. See 2 Harris, Handling Federal Estate and Gift Taxes, § 18:8, p 409. A contrary regulation was struck down in *Internal Revenue Comm'r v Shattuck,* 97 F2d 790 (CA 7, 1938).

There are many cases where blockage was taken into consideration. See *Helvering v Maytag,* 125 F2d 55 (CA 8, 1942), cert den 316 US 687 (1942), *Avery v Comm'r,* 3 TC 963 (1944), *Allen v Comm'r,* 3 TC 1224 (1944).

39 Bonbright, p 80.

real and tangible personal property not exempt by law."[40]

The majority states that the "identity of the person owning an interest in the property or whether there are other parcels which are owned by the same taxpayer," has no bearing on true cash value, and that "the fact of ownership is not a germane consideration in determining value," and that in considering "whether similar tax parcels are owned by the same person,"[41] the Tax Tribunal violated "the sum and substance of the uniformity mandate."[42] Continuing with this theme, the majority states that the Tax Tribunal's approach "would produce an inherent preference in favor of developers, as opposed to taxpayers who own single or scattered lots."[43] The majority concludes that "[t]wo identical lots, available for the same ultimate use, would not be equally taxed."[44]

A

The premise that there are "two identical lots" that "would not be equally taxed" ignores a fundamental difference between a lot that has been "sold" and a lot that is "unsold."[45] A lot that has been "sold" has been marketed to a consumer, while a lot that remains "unsold" has not, as yet, been marketed to a consumer. Just as value is added to vacant land when it is purchased from a farmer/land speculator, platted and improved with utilities and roads, so, too, value is added to plat-

---

[40] See n 7.

[41] *Ante,* pp 640-641.

[42] *Id.,* p 641.

[43] Quoting with approval *Sup'r of Assessments of Calvert Co v St Leonard Shores Joint Venture,* n 17 *supra,* p 215.

[44] *Ante,* p 641.

[45] *Id.,* pp 639-640.

ted subdivision lots when they are marketed to a consumer.

It requires energy and capital to hold and carry lots until they can be marketed, and to market lots to consumers: advertising, office overhead, sales persons, brokerage commissions, weed cutting and other maintenance, security guards, liability insurance, legal, accounting, property taxes, and interest on the capital involved and at risk.[46]

Until the costs involved have been incurred, and the value that is added by marketing a lot to a consumer has, in fact, been added, the lot—in the line of production from vacant land to house con-

---

[46] Interest during the years in question was an overwhelming cost, a cost that brought on the real estate recession and the construction of homes, especially production homes, close to a standstill. Fuller, the township's appraiser, said it would take approximately three years to market these lots to consumers. As a result of the real estate recession, Rose took out one building permit for this subdivision in 1980, none in 1981 or 1982, and seven in 1983. Rose had sold 135 lots with houses constructed thereon between August 1977 and November 1979, three in 1980, two in 1981, one in 1982, four in 1983 and four in 1984. This history suggests it would have taken longer than three years to market the one hundred lots to consumers in 1980-1983.

In some of the tax years in suit, the United States Government was borrowing money at fourteen percent per year, and the prime rate approached twenty percent per year. Twelve percent per year on a $10,000 lot, the lowest wholesale value set by the Tax Tribunal for any of the tax years, would be $1,200 for one year. The "discount" allowed by the Tax Tribunal was $2,000. Thus, if all the lots could have been sold within one year—and both appraisers agreed that they could not all have been sold in one year—and all the other costs, real estate taxes, advertising, brokerage, insurance, etc., did not exceed $800, and the interest did not exceed $1,200, Rose would have merely recaptured, by reason of the $2,000 discount, his expenditures therefor. And if it took three years to market the lots, then the $2,000 discount was grossly inadequate.

If Rose had bought one of the lots for $14,500 at the end of 1981—the retail value which the majority states was the true cash value as a matter of law—and the interest cost was twelve percent, or $1,740, a year, the interest would have mounted to $5,220 by December 31, 1984, when the retail value of the lot, according to the majority, was $13,000, so that Rose would have lost the difference between $13,000 and the sum of the $14,500 retail price and the $5,220 in interest, $19,220, or a loss of $6,220, to say nothing of real estate taxes, advertising expenses, and brokerage fees.

structed and occupied—is truly worth less than a lot that has been marketed to a consumer.

To be sure, recognition of the difference between a lot that has been marketed to a consumer and one that has not, can be characterized as treating one owner differently than another. That is a false characterization that obscures the real economic difference between a lot, the value of which has been enhanced by marketing it to a consumer, and a lot the value of which has not been so enhanced.

B

Uniformity of taxation does not refer to the method of valuation by which true cash value is determined. Uniformity of taxation refers to the proportion of true cash value at which all property should be assessed. That proportion is now constitutionally and statutorily fixed at fifty percent.[47]

If the usual selling price of the one hundred lots was accurately determined on a wholesale basis, and the usual selling prices of comparable lots were accurately determined on a retail basis, and all the lots are assessed at fifty percent of the usual selling price, there would be no violation of the principle of uniformity. Each lot or group of lots would then have been assessed at the same proportion of its accurately determined usual selling price. Uniformity of taxation is disturbed when property is assessed at differing proportions of the usual selling price, not when different modes of valuation are employed to arrive at the usual selling price.

[47] Except as otherwise provided in subsection (2), property shall be assessed at 50% of its true cash value pursuant to section 3 of article 9 of the state constitution of 1963. [MCL 211.27a(1); MSA 7.27(1)(1). See n 7.]

This Court has acknowledged that there is not a single uniform approach to valuation:

> While uniform approach may be desirable, it is not the ultimate goal of valuation. The ultimate goal is uniform true cash values. They are not necessarily achieved by a single uniform approach. . . . [T]he use of a single uniform mode . . . is not forbidden but such use should not foreclose other methods and approaches, depending upon the nature of the particular property, to achieve uniform assessment. With all approaches available for use and comparison of results, valuations of property for assessment purposes are more likely to reflect true cash values than will be the case if only a single mode is used. [*Fisher-New Center Co v State Tax Comm*, 380 Mich 340, 369-370; 157 NW2d 271 (1968).]

### C

Tangible personal property is subject to ad valorem personal property taxation.[48] Inventories were, until exempted as of the 1976 tax year,[49] required to be valued essentially at cost, and tangible personal property has been generally taxed at historical cost less depreciation. Those modes of valuing tangible personal property have been the means by which the true cash values of inventories of manufactured products and tangible personal property were and are reported for ad valorem personal property taxation.

The constitution and the General Property Tax Law places "*all taxable property, both real and personal*" in "*one category* to be uniformly assessed and taxed" (emphasis added) and required "uniform assessment and taxation of all tangible property, *both real and personal* other than intan-

---

[48] MCL 211.81 *et seq.;* MSA 7.8 *et seq.*

[49] MCL 211.9c; MSA 7.9(3).

gibles, at the standard of true cash value . . . ." *In re Appeal of General Motors Corp (Livonia v State Tax Comm)*, 376 Mich 373, 377-378; 137 NW2d 161 (1965). (Emphasis in original.)

Nevertheless, establishing the true cash value of inventories essentially at cost and of tangible personal property at historical cost less depreciation, has been thought to be appropriate although other modes of valuation, e.g., comparable sales, were and are employed for valuing real property.

D

Establishing the usual selling prices of tangible personal property at historical cost less depreciation meant that a truck had one value for personal property taxation in the hands of the manufacturer, a higher value in the hands of a dealer, and still a higher value in the hands of a consumer.

Two "identical" trucks, side by side at a traffic light, one owned by a manufacturer/dealer, and the other by a consumer, were valued for ad valorem personal property taxation at different values, and thus "would not be equally taxed." It has not been suggested, however, that General Motors, Ford, or Chrysler should have been required to value inventories of unsold trucks at the highest price that a consumer had paid for a truck, or that their dealers were required to value their unsold trucks at the highest price they had sold a truck to a consumer, even though the highest and best use of the truck was exemplified by the truck driven by or for a consumer. It was recognized that until the truck is sold to a consumer, until the value added by marketing it to a consumer had, in fact, been added, a truck is

worth less in the hands of the manufacturer or in the hands of the dealer than the consumer paid.[50]

There is clearly a difference between a lot that is owned by a consumer and a lot that is still merchandise. Merchandise must be marketed. Business persons who buy merchandise cannot, as Fuller, the township's appraiser acknowledged, afford to pay what the consumer pays. There is no "unfairness" to the consumer in assessing him on the basis of the usual selling price he pays, and the merchandiser on the basis of the lower usual selling price he pays.

Recognizing the difference between a wholesale and a retail market price simply recognizes the usual selling price to the owner, whether builder or consumer.

E

This Court observed in *In re Appeal of General Motors Corp, supra,* p 378, that *"[i]f the requirement of cash value were met, the requirement of uniformity would also be met . . . ."* (Emphasis added.) The majority puts the cart before the horse when it employs the principle of uniformity as justification for ignoring a market value—the usual selling price in the wholesale market—and, hence, true cash value.

In *CAF Investment Co v Saginaw Twp,* 410 Mich 428, 463; 302 NW2d 164 (1981), it was argued that

[50] It is an all too familiar experience that after an automobile or a house has been purchased, it may be worth less than one has paid. If the buyer wishes or needs immediately to resell the automobile or house, he will generally receive less than he paid. All would understand that if the automobile or house were to be resold by the buyer to the dealer, the dealer would pay less than the retail price the buyer paid and the dealer expects to obtain, so that the dealer could cover the costs of holding, carrying and reselling the automobile or house, to say nothing of realizing a profit for his services in selling it once again.

the rent actually payable under an "economically unfavorable lease" should be ignored because otherwise two properties, side by side, would be assessed differently in violation of the constitutional requirement of uniformity of assessment. This Court rejected that argument stating that the argument "begs the question. *The touchstone of uniform assessment is the true cash value or usual selling price of the property.* Assessment decisions must recognize limitations or restrictions which have a bearing on the selling price of property."[51] (Emphasis added.)

Decisions respecting the value of vacant lots should similarly recognize the difference between lots that are still in the chain of production from vacant land to house occupancy, and lots that have already been marketed to a consumer. Just as the owner of unencumbered property located near property encumbered with an economically unfavorable lease may, without violation of the uniformity clause, find that his property has been valued and assessed for a greater amount than the property subject to the unfavorable lease, so, too, a consumer who owns a lot may, without violation of the uniformity clause, be assessed a greater amount than the merchant-owner of a lot that has not been marketed to a consumer.

### VII

The Tax Tribunal did not fail to consider the statutory provisions alluded to by the majority,[52] directing, in effect, that separate parcels or lots be

---

[51] *First Interstate Bank of Oregon v Dep't of Revenue,* n 16 *supra,* is distinguishable in part because the law of Oregon ignores an uneconomic lease in determining the market value of property for property taxation. *Id.,* 10 Or Tax 452, 456 (1987).

[52] *Ante,* p 632, n 4.

separately *assessed.* The Rose lots were separately assessed by the Tax Tribunal.[53]

The General Property Tax Law does not require that true cash value be determined on a retail basis. Lots can be as readily *assessed* on an "individual" or "separate" basis employing a wholesale value as a retail value.

The requirement of separate *assessment,* lot by lot, does not preclude consideration of *evidence* of sales of comparable lots in quantities or *valuation* of lots on a bulk basis. The requirement of separate assessment does not change the meaning or definition of usual selling price/true cash value, and does not justify ignoring evidence of usual selling prices and market values established in a wholesale market.

Valuation precedes assessment. Once property has been valued, its usual selling price/true cash value established, assessment is essentially a mechanical matter. A valuation based on comparable bulk sales can readily be divided by the number of parcels or lots to arrive at an individual or separate assessment for each parcel or lot so that the statutory command of separate assessment can be met. The mandate of separate assessment of each parcel or lot does not mandate any particular method of valuation or preclude the consideration of all relevant evidence bearing on valuation.

## VIII

There are two main parts to the majority's highest and best use argument:

---

[53] Rose's appraiser did indeed opine regarding the value of the one hundred lots as a group and provided evidence, as did the township's appraiser, of group sales prices. Rose's appraiser indicated that the assessment for each lot was to be determined by dividing the group valuations by the number of lots, one hundred for the first three tax years and ninety-two for the fourth tax year.

—The highest and best use of Rose's lots is single family residence;

—The Tax Tribunal is required to hypothesize the existence of one hundred buyers at the highest price that a single lot could be sold at retail without regard to whether there were actually one hundred buyers at that price.

The highest and best use conception concerns the *use* to which property can be put and not the *market* in which it is sold. The one hundred lots would be put to the same use whether Rose itself built and sold houses on the lots, or Rose had theretofore or then established, or were to have employed, a selling organization to sell the lots at retail prices to consumers, or the lots were sold by Rose to builders at a wholesale price.

A

Because it is unlikely that the zoning of the lots in Rose's platted subdivision in Independence Township *could* have been changed in the tax years from single family residence to manufacturing, mobile home park, low-rise, medium-rise or high-rise residential, commercial, or office, the higest and best use of the lots in the subdivision was, indeed, single family residence. This means only that Rose's and the township's appraisers were obliged, as they both recognized, to value the lots for single family residence use, and not for manufacturing, mobile home park, low-, medium-, or high-rise residential, commercial or office, or some other use.

That single family residence is the highest and best use of the lots says nothing about whether the lots should be valued at the wholesale market price or at the retail market price for that highest and best use or at a combination of both the

wholesale market and retail market prices for that highest and best use.

### B

In the absence of comparable sales, the appraisers would, indeed, have been obliged to hypothesize a market price for the highest and best use, single family residence. A particular parcel of real property cannot be permitted to escape its share of the burden of taxation because the parcel cannot be readily marketed or sold.[54]

### C

Until a house is actually constructed, a certificate of occupancy issued, a consumer buys the house and moves in, a residential lot is, again, but work in progress toward realization of the highest and best use, single family occupancy.

Although a lot is zoned single family residence, and single family occupancy is the highest and best use, a lot cannot properly be valued *as if* the value, that would be added to the lot by *marketing the lot to consumers,* another step toward realization of the highest and best use, has actually been added.

Valuing lots on the basis of the actual selling price of lots in the wholesale market to builders would not "contradict" a "market approach," and

---

[54] *Moran v Grosse Pointe Twp,* 317 Mich 248; 26 NW2d 763 (1947), is often cited for the proposition that where a market is nonexistent or thin, the assessor of necessity must hypothesize a market and determine the true cash value from all the available data. Clearly, that is an accurate statement for extraordinary circumstances.

*Moran* was decided before *Fisher-New Center, supra.* This Court in *Moran* ruled that the plaintiff had failed to prove that market factors "were intentionally and fraudulently ignored." *Id.,* p 252. The Court observed that "[i]n the absence of fraud, the determination of the State Tax Commission was final." *Id.,* p 256. It is questionable whether today, with a heightened standard of review, an assessor would be given as much leeway as was the assessor for Grosse Pointe Township.

would not be "inconsistent with the recognized highest and best use of the property."[55]

Valuing lots on the basis of comparable sales in the wholesale market would contradict only the assertion that "the market approach, based on individual lot sales" is the most accurate measure of the true cash value of the lots. The majority concludes by restating the question presented: What is the most accurate measure of the usual selling price/true cash value of the one hundred lots? And by responding, inscrutably: Highest and Best Use.

### D

In sum, there were—the Tax Tribunal found and the majority does not conclude otherwise—two markets, a wholesale market and a retail market. This Court cannot properly ordain that one market—the retail market—is the Court approved market without ignoring both the legislative directive that property shall be valued at its *"usual"* selling price and the constitutional command that property shall be assessed at its *"true"* cash value.

There was ample evidence of a wholesale builder's market. The Tax Tribunal did not commit error of law in considering evidence of comparable sales in the wholesale builder's market, together with the evidence of comparable sales in the retail consumer's market, in determining the true cash values of the lots in the tax years in suit.

### IX

I would reverse the Court of Appeals and affirm the Tax Tribunal.

---

[55] *Ante,* p 639.