(875 P.2d 297)
No. 70,346

J. Mark Hixon, Shawnee County Appraiser, *Appellant,* v.
Lario Enterprises, Inc., *Appellee.*
Aff'd as modified 257 Kan. 377, 892 P.2d 507 (1995).

Opinion filed June 3, 1994.

*Sandra L. Jacquot,* assistant county counselor, and *Linda P. Jeffrey,* county counselor, for appellant.

*Robert J. O'Connor* and *Pamela Clancy,* of Morrison & Hecker, of Wichita, for appellee.

Before Rulon, P.J., Green, J., and Janice D. Russell, District Judge, assigned.

Russell, J.: Mark Hixon, the Shawnee County Appraiser (The County), appeals from the decision of the district court affirming the Board of Tax Appeals (BOTA). We reverse and remand the case with directions.

The central question of this appeal is whether the district court and BOTA erred in using the developer's discount method to value multiple parcels of property within a subdivision. This

method results in multiple units of property owned by one entity being valued as one unit.

At issue is BOTA's 1989 appraisal of the Montara subdivision of Topeka, Kansas. The subdivision was originally built as a housing development for Forbes Air Force Base. When Forbes closed, the City of Topeka acquired the property and subsequently sold it to Lario Enterprises, Inc. (Lario). The subdivision comprises between 650 and 700 individual parcels.

The parties agree that the Montara parcels are properly divided into five categories. Category 1 consists of some 117 vacant lots. Category 2 contains 386 single family rental units. Category 3 consists of 158 units that are not habitable because of an advanced state of disrepair. Category 4 contains several model homes and offices. Category 5 consists of three vacant lots and an RV storage area.

The County initially appraised the properties at $18,099,240. Lario appealed to BOTA, claiming that the proper appraised value was $9,600,000 for the properties.

BOTA issued an opinion generally adopting Lario's appraisal methods but modifying the appraisal amount to $12,028,600. After BOTA denied the County's motion to reconsider, the County filed a motion for judicial review in the district court. The district court affirmed the BOTA decision, and the County appealed.

This appeal involves only categories 1, 2, 3, and 5. BOTA accepted the County's appraisal as to category 4 (the model homes and offices), and Lario has not appealed that valuation, so the valuation of the properties contained in category 4 is not an issue.

Review of BOTA's order does not reveal the precise method which BOTA used to value categories 2 and 5. It is plain that BOTA used the developer's discount method to value the 117 vacant lots in category 1. As we understand, BOTA utilized the developer's discount method to value the 158 vacant, uninhabitable units in category 3. The 386 single family rental units in category 2 were appraised as one single unit, utilizing the direct capitalization approach. Category 5, which contained three vacant lots and an RV parking area, was appraised as one single unit, though BOTA's opinion does not state what appraisal method was used in reaching the appraised value.

The district court treated BOTA's appraisal as if all of the four questioned appraisals were made using the developer's discount method. The County's appeal challenges both the developer's discount approach to appraisal for tax purposes and BOTA's valuation of multiple parcels owned by one entity as a single unit. Because the ownership of multiple parcels is central to the developer's discount method of valuation, the two issues are inextricably intertwined.

Lario alleges the County did not properly preserve the right to appeal the question of valuing multiple parcels as a single unit. However, an integral part of the County's challenge method was the argument that the developer's discount method was constitutionally and statutorily infirm because it valued property based upon ownership versus the value of the individual parcel. We conclude both issues were sufficiently preserved for appeal.

At the outset, we note that BOTA is a specialized agency that exists to decide issues concerning taxation and valuation, and its decisions should be given great credence and deference when it is acting within its area of expertise. *In re Tax Appeal of Director of Property Valuation*, 14 Kan. App. 2d 348, 353, 791 P.2d 1338 (1989), *rev. denied* 246 Kan. 767 (1990). " 'If, however, the reviewing court finds that the administrative body's interpretation is erroneous as a matter of law, the court should take corrective steps; the determination of an administrative body on questions of law is not conclusive, and, while persuasive, is not binding on the courts.' " *Board of Johnson County Comm'rs v. Smith*, 18 Kan. App. 2d 662, 664, 857 P.2d 1386 (1993). The party challenging the validity of the agency action bears the burden of proving the invalidity of the action. K.S.A. 77-621(a)(1).

We conclude that BOTA's valuation of Lario's property in this case is constitutionally infirm and is invalid under Kansas statutes. Therefore, despite the deference ordinarily granted to BOTA's decision on property valuation for tax purposes, we must reverse.

Article 11, § 1(b) of the Kansas Constitution provides:

"(1) The provisions of this section (b) shall govern the assessment and taxation of property on and after January 1, 1989, and each year thereafter. Except as otherwise hereinafter specifically provided, the legislature shall provide for a *uniform and equal basis of valuation and rate of taxation of all property subject to taxation* . . . ." (Emphasis added.)

The legislature, in answer to the constitutional mandate that it provide for a uniform and equal basis for taxation, has enacted various statutory provisions. K.S.A. 1993 Supp. 79-1439(a) states that all real property which is subject to ad valorem taxation shall be appraised uniformly and equally as to class and, unless otherwise specified, shall be appraised at its fair market value as defined by K.S.A. 1993 Supp. 79-503a which provides:

" 'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. For the purposes of this definition it will be assumed that consummation of a sale occurs as of January 1.

. . . .

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

(a) The proper classification of lands and improvements;

(b) the size thereof;

(c) the effect of location on value;

(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

(e) cost of reproduction of improvements;

(f) productivity;

(g) earning capacity as indicated by lease price or by capitalization of net income;

(h) rental or reasonable rental values;

(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values; and

(j) restrictions imposed upon the use of real estate by local governing bodies, including zoning and planning boards or commissions; and

(k) comparison with values of other property of known or recognized value. . . .

"The appraisal process utilized in the valuation of all real and tangible personal property for ad valorem tax purposes shall conform to generally accepted appraisal procedures which are adaptable to mass appraisal and consistent with the definition of fair market value unless otherwise specified by law."

K.S.A. 1993 Supp. 79-501 states that *each parcel* shall be appraised at its fair market value and that the price such property would bring at auction or at a forced sale may be considered.

The statutory scheme for valuing property for tax purposes is a surrogate for a real marketplace event; the statute requires the

appraiser to pretend, in effect, that each piece of property is sold on January 1 of the year in which the appraisal is done in an arms length transaction. In this imaginary sale, the price paid by a well informed buyer and accepted by a well informed seller, each acting without undue compulsion, constitutes the "fair market value" at which a particular piece of property must be appraised.

In determining the validity of a tax assessment, the essential question is whether the mandates of K.S.A. 1993 Supp. 79-503a have been considered and applied. *Northern Natural Gas Co. v. Williams*, 208 Kan. 407, Syl. ¶ 7, 493 P.2d 568, *cert. denied* 406 U.S. 967 (1972).

The developer's discount method of valuation, which is also known as the subdivision approach or the development approach, consists of a discounted cash flow analysis which considers a projected absorption rate and the corresponding drop in income from the sale of lots. Inherent in this approach is the notion that, if the owner of multiple lots places them all on the market at once, there would not be enough buyers in the marketplace who would be willing to pay full market price for each lot. Such approach assumes that the seller would have to discount the price of the property to lure additional buyers into the market. The discount is calculated by utilizing an absorption factor, which is based upon the number of willing buyers in any given year. In the alternative, the developer's discount method could be defined as the price that the owner of multiple lots would accept for all of its lots when sold to one buyer; that buyer would presumably pay a discounted price for each individual lot because the buyer would take the absorption factor into account in determining how quickly, and for what price, he or she could in turn sell the lots to other buyers.

According to David Craig, Lario's expert, the steps in the process are as follows:

(1) Establish an average value for the lots;
(2) project future sales expenses and holding costs;
(3) estimate the required absorption period;
(4) derive the most profitable net income and pre-tax cash flow from sales of the lots by subtracting all expenses from gross sales;

(5) determine an internal rate of return which would attract a prudent investor to invest in a similar situation with comparable degrees of risk, non-liquidity, and management burdens; and

(6) convert the cash flow into a present value by discounting at an appropriate yield rate.

On the surface, Lario's argument that the developer's discount method is appropriate under Kansas law is persuasive. Lario argues this is the only method that yields a fair market value for multiple lots owned by one entity because it reflects what would actually happen to the price of the lots if they were all placed on the market on the same day. Lario argues that it is the only method that reflects the discounting that occurs when a buyer purchases, in bulk, multiple lots that are held for resale.

After fully considering this matter, we are convinced there are several flaws in Lario's arguments.

First, the Kansas Constitution mandates a "uniform and equal basis of valuation . . . of all property subject to taxation." Kan. Const. Art. 11, § 1(b). The Constitution speaks in terms of *property*, not the identity of owners or buyers, and Lario's valuation method focuses strongly on the identity of owners and/or buyers.

Second, Lario's approach results in unequal treatment of owners of similar lots. The record shows that some of the lots in the Montara subdivision had already been purchased by individuals at the time of the appraisal. The developer's discount method would treat investors in real estate differently, depending on where their holdings were located; an investor holding multiple lots in a subdivision would be entitled to claim the developer's discount as a method of valuation, while an investor holding the same number of lots, scattered around the city, would not be entitled to have the developer's discount applied to his or her property for tax purposes.

Finally, Lario's argument is premised on the notion that the owner of multiple lots in a subdivision is entitled to a discounted tax appraisal because the statute requires the appraiser to assume a sale of all of his lots on January 1. We acknowledge that Lario is correct, but we are compelled to add that K.S.A. 1993 Supp. 79-503a requires the assumption that *every square inch of real*

*estate in the state of Kansas* is sold on the same day. Under those circumstances, Lario's argument that it is entitled to special treatment because the statute creates the fiction that it, along with all other property owners, will sell its real estate holdings on January 1, can readily be seen to be fallacious.

This court, defining the concept of constitutionally valid tax assessment, has said:

" 'Uniformity in taxing implies equality in the burden of taxation, and this equality cannot exist without uniformity in the basis of assessment as well as in the rate of taxation. . . . [Citations omitted.]

" 'It is apparent that uniformity is necessary in valuing property for assessment purposes so that the burden of taxation will be equal. [Citation omitted.] . . . Uniformity of taxation does not permit a systematic, arbitrary or intentional valuation of the property of one or a few taxpayers at a substantially higher valuation than that placed on other property within the same taxing district . . . . [T]he inequality or lack of uniformity, if knowingly high or intentionally or fraudulently made, will entitle the taxpayer to relief." In re Tax Appeal of Andrews, 18 Kan. App. 2d 311, 316, 851 P.2d 1027 (1993) (quoting Addington v. Board of County Commissioners, 191 Kan. 528, 382 P.2d 315 [1963]).

The opposite is also clearly true. The systematic and intentional valuation of one or a few taxpayers' property at a lower rate entitled the taxing entity to relief.

Obviously, BOTA's acceptance of the developer's discount method of valuing Lario's property runs afoul of the mandate of *Andrews*; it results in a systematic valuation of lots owned by Lario within the Montara subdivision at a lower value than those assigned to other lots owned by individuals within the same subdivision. Since it systematically values Lario's lots at a lower price, it results in an inequality of the burden of taxation.

In its brief, Lario relies heavily on several memoranda of the Kansas Department of Revenue, Division of Property Valuation (DPV), which approve the use of the developer's discount approach to appraisal. A DPV memorandum dated January 5, 1989, provides as follows:

"We have received several inquiries and requests for clarification of subdivision development appraisal procedures. Although mapping specifications call for the creation of individual parcels *when a subdivision plat is filed*, the appraisal should actually reflect the aggregate value of the development.

"The appraiser must consider the rate at which a project will be completed and the number of vacant lots expected to be sold in the local market each

year. This absorption period for typical subdivisions covers several years. To account for the impact of this projection on value, a factor reflecting the discount rate should be estimated by ascertaining the appropriate risk rate in the marketplace. This factor is then applied to the expected net proceeds from lot sales over the completion/absorption period to arrive at the present value of the land. *When a newly-platted subdivision has been mapped,* an influence factor can be applied to each lot or a unique neighborhood CALP model can be developed to accomplish this adjustment." (Emphasis added.)

## A DPV memorandum dated February 16, 1990, provides:

"Although K.S.A. 79-405 requires platted lots in a subdivision to be identified and taxed individually, the appraisal should be based upon the entire tract of land. When the appraisal of the whole tract is complete, the market value shall then be allocated among the developer's individual lots. This requires the county appraiser to distinguish between the gross sellout (aggregate of individual retail prices) and the wholesale value of the development as one unit, which is market value.

"This conclusion reconfirms the Division's position with respect to the subdivision valuation issue addressed in the Director's update #26 dated January 5, 1989. County appraisers have been directed to use the development approach when comparable sales data (for entire subdivisions) is limited. You are expected to obtain pertinent income and expense data from developers and prepare an estimate of value based on the present worth of the projected stream of net income.

"The use of discounted cash flow models have gained wide acceptance in the valuation of this type of investment property over the last few years. The subcommittee strongly recommends the use of a detailed cash flow analysis which itemizes the entire income and expense flow on a year by year basis during the absorption period. In selecting the discount rate, the appraiser shall consider the desirability of the project, the risk involved and the competitive rate of return required to attract capital to the project. This methodology shall be given serious consideration at the formal conference with any developer who has filed a 1989 tax payment under protest. . . .

"A related issue, brought up by appraisers, concerns the impact of individual subdivision lot sales on the ratio study. These parcels may often sell for two or three times their allocated value when purchased on an individual basis. This is no cause for alarm because the comparison is not appropriate. The subject of the appraisal is a group of lots and the allocated per parcel value is simply an administrative requirement. A sale of one lot from a developer's holding is very similar to a split which takes place from an acreage tract. The only difference is that the appraiser has some prior knowledge of how the 'splits' will likely occur in a subdivision from the recorded plat. Although the sale data will be very useful for arriving at individual lot values it will not be used in the official state assessment/sales ratio study."

We conclude that Lario's reliance on these memoranda is misplaced. It is clear that the January 5, 1989, memorandum refers to the valuation of a planned subdivision, not a completed one. The memorandum speaks of valuing subdivision parcels "when a subdivision plat is filed" and "the rate at which a project will be completed." In other words, the memorandum approves use of the developer's discount method to appraise parcels when the plat has been filed, but development, *i.e.*, installing roads and utilities has not been accomplished. The memorandum does not approve use of the developer's discount method when the plat has been filed, streets and curbs have been laid, utilities have been installed, and homes have been built.

The district court accepted Lario's argument that *State Highway Commission v. Lee*, 207 Kan. 284, 485 P.2d 310 (1971), and *Great Northern Ry. v. Weeks*, 297 U.S. 135, 80 L. Ed. 532, 56 S. Ct. 426 (1936), taken together, dictate approval of the developer's discount approach to tax appraisal. In *Lee*, the Kansas Supreme Court ruled that it was constitutional to use the development approach to value a tract of land for condemnation purposes. In *Weeks*, the United States Supreme Court stated, "The principles governing the ascertainment of value for the purposes of taxation, are the same as those that control in condemnation cases . . . ." 297 U.S. at 139.

Lario's reliance on this pair of cases, however, is misplaced because *Lee* is distinguishable from the case at hand. The property in question in *Lee* was a tract of raw ground that was slated for development, but the plat had not been filed. The Supreme Court there approved the development approach because development was imminent. We find *Lee* to be inapplicable to this case, where development has been accomplished and the owner of the subdivision is still simply holding some of the lots for resale.

Lario has also cited several cases from other jurisdictions which it claims support the use of the developer's discount method. They are *Dash v. State*, 491 P.2d 1069 (Alaska 1971); *Dept. of Transp. and Dev. v. Hammons*, 550 So. 2d 767 (La. App. 1989); *Ramsey County v. Miller*, 316 N.W.2d 917 (Minn. 1982); *State by Spannaus v. Heimer*, 393 N.W.2d 687 (Minn. App. 1986); *Tacchino v. State ex rel. Dep't Hwys.*, 89 Nev. 150, 508 P.2d

1212 (1973); *Akey v. State*, 108 App. Div. 2d, 963, 484 N.Y.S.2d 947 (1985); and *Cherokee Water Co. v. Appraisal Dist.*, 773 S.W.2d 949 (Tex. Civ. App. 1989), *aff'd* 801 S.W.2d 872 (Tex. 1990).

We have examined these authorities, and we conclude that they are not determinative of the issue. Of the cases cited by Lario, only the Texas case concerns appraisal for tax purposes, and that case cannot be said to approve the developer's discount approach to tax appraisal. The developer's discount method had been utilized there by the taxing entity; the court found that the taxpayer had failed to challenge the method of appraisal during the administrative process and in the lower court and, therefore, could not raise a challenge to that appraisal approach on appeal.

In support of its position that the use of the developer's discount method is inappropriate for tax valuations, the County cites cases from other jurisdictions that had rejected it.

In *First Interstate Bank v. Dept. of Rev.*, 306 Or. 450, 760 P.2d 880 (1988), the Oregon Supreme Court rejected the use of the developer's discount method as a proper method of valuing a subdivision which was platted, divided into lots, and had streets, curbs, water and sewers in place. Though the court stated that the developer's discount could be an appropriate method of valuing an undeveloped subdivision, it stated, "The value of each lot, by itself, not as a portion of a larger piece of property, must be assessed." 360 Or. at 453. In part, the court based its reasoning on Oregon statutes that required the property to be listed on assessment rolls by parcels.

In accord with the Oregon case are Michigan and Maryland cases. In *Rose Bldg. Co. v. Independence Twp.*, 436 Mich. 620, 462 N.W.2d 325 (1990), the Michigan Supreme Court rejected the use of the approach when valuing a developed subdivision with improved lots, although the court did acknowledge the possible appropriateness of the use of the developer's discount method for valuing an undeveloped tract: "A discount may be appropriate where an undeveloped tract of land exists without improvements. The recognized 'developmental approach' to valuation allows for such a discount. However, this approach is appropriate only in instances involving unimproved property." 436 Mich. at 635.

In *St. Leonard Shores Joint Ven. v. Supervisor*, 307 Md. 441, 514 A.2d 1215 (1986), the Maryland Court of Appeals rejected the developer's discount method of valuation for unsold lots in a subdivision. The court stated, "Regardless of whether a buyer for each lot actually exists, the assessor is required to assess each lot *as if* a willing buyer exists." 307 Md. at 446.

Although the cases from other jurisdictions are instructive, in the final analysis, this case must be decided upon the basis of Kansas statutes and the Kansas Constitution. K.S.A. 1993 Supp. 79-501 states, "Each *parcel* of real property shall be appraised at its fair market value in money." (Emphasis added.) The Kansas Constitution, Article 11, § 1(b) mandates a "uniform and equal basis of valuation."

These statutory and constitutional provisions compel the conclusion that BOTA erred in utilizing the developer's discount method of valuing the lots owned by Lario. The developer's discount method of valuation is based upon ownership and is not based upon the value of each parcel of property as mandated by K.S.A. 1993 Supp. 79-501. The developer's discount method of valuation, as applied to the facts of this case, systematically favors the owners of multiple lots over the owners of single lots within a subdivision. Such method of valuation systematically favors the developers of subdivisions over the owners of lots located throughout the taxing unit. Therefore, the developer's discount method of valuation, as applied, is unconstitutional and violative of the Kansas statutory scheme of valuing property for ad valorem tax purposes.

BOTA's appraisal (and the district court's approval of the same) of categories 1 and 3 is reversed. To the extent that BOTA discounted the value of parcels in categories 2 and 5 to account for absorption in the marketplace due to the single ownership of multiple lots, that valuation is also reversed.

The decision of the district court is reversed, and the case is remanded to district court with directions to remand this case to the Board of Tax Appeals for further proceedings to value Lario's properties in accord with the holdings of this opinion.