NOT DESIGNATED FOR PUBLICATION

No. 122,201

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeal of
KANSAS STAR CASINO, L.L.C.
for the Year 2018 in Sumner County, Kansas.

MEMORANDUM OPINION

Appeal from Kansas Board of Tax Appeals. Opinion filed January 28, 2022. Affirmed.

*David R. Cooper* and *Andrew D. Holder*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellant Sumner County.

*Jarrod C. Kieffer* and *Frank W. Basgall*, of Stinson LLP, of Wichita, for appellee Kansas Star Casino, L.L.C.

Before GARDNER, P.J., SCHROEDER and CLINE, JJ.

PER CURIAM: This case is the most recent in a continuous succession of property tax disputes between Sumner County, Kansas (the County), and Kansas Star Casino, L.L.C. (Kansas Star), in Mulvane, Kansas. The County appeals the decision of the Board of Tax Appeals (BOTA) establishing a valuation of Kansas Star's real property for imposing ad valorem tax for the 2018 tax year.

While the parties continue to quarrel, they have significantly narrowed their dispute. This appeal involves the limited issue of Kansas Star's commercial use value; specifically, the valuation of its "ancillary facilities" (the indoor arena, conference center, and open-air pavilion). The County argues Kansas Star's management contract with the State is a land use restriction which requires consideration of the ancillary facilities in

1

Kansas Star's fair market value. The County contends BOTA erred when it wholly depreciated those facilities as functionally obsolete for superadequacy.

Other panels of this court have rejected the County's arguments when considering BOTA's valuation decisions in past tax years. We see no reason to disagree with those well-reasoned decisions, so we affirm BOTA's valuation of Kansas Star for tax year 2018.

FACTS

In what has become a nearly annual event, the ongoing dispute between the County and Kansas Star concerning the value of Kansas Star's property continues. Panels of this court have considered appeals by these same parties for every tax year from 2012 through 2017. See *In re Equalization Appeal of Kansas Star Casino*, 52 Kan. App. 2d 50, 362 P.3d 1109 (2015) (2012 tax year); *In re Equalization Appeals of Kansas Star Casino*, No. 119,438, 2020 WL 2296977 (Kan. App.) (unpublished opinion) (2016 and 2017 tax years), *rev. denied* 312 Kan. 892 (2020); *In re Equalization Appeal of Kansas Star Casino*, No. 116,782, 2018 WL 3486173 (Kan. App. 2018) (unpublished opinion) (2015 tax year); *In re Equalization Appeal of Kansas Star Casino*, No. 116,421, 2018 WL 2749734 (Kan. App. 2018) (unpublished opinion) (2014 tax year); *In re Equalization Appeal of Kansas Star Casino*, No. 115,587, 2018 WL 2748748 (Kan. App. 2018) (unpublished opinion) (2013 tax year). Most recently, this court also issued an opinion concerning BOTA's decision on remand for the 2014 and 2015 tax years. *In re Equalization Appeal of Kansas Star Casino*, No. 121,469, 2021 WL 2021829 (Kan. App. 2021) (unpublished opinion), *rev. denied* 314 Kan. __ (September 27, 2021).

Many of the background facts, especially those concerning the history of the Kansas Expanded Lottery Act (KELA), K.S.A. 74-8733 et seq., and the ultimate decision to award Kansas Star the management contract, have been recounted in previous opinions

by this court. Likewise, the arguments the County makes on appeal are very similar to those previously argued. As such, we will summarize and discuss these facts and arguments as necessary.

KELA divided the state into the northeast, south central, southwest, and southeast gaming zones and authorized the Kansas Lottery Commission to operate a single gaming facility in each gaming zone. K.S.A. 74-8734(a), (d), (h)(19). Kansas Star operates one of four state-sponsored gaming enterprises authorized under KELA.

Under KELA, the State owns a casino's gaming operations but hires gaming facility managers through management contracts to construct and own improvements and infrastructure and manage gaming operations. KELA states that an approved management contract "allow[s] the lottery gaming facility manager to manage the lottery gaming facility in a manner consistent with this act and applicable law, but shall place full, complete and ultimate ownership and operational control of the gaming operation of the lottery gaming facility with the Kansas lottery." K.S.A. 74-8734(h)(17). Kansas Star—operating under its parent company—is the gaming facility manager of the south central gaming zone, which consists of Sumner County and Sedgwick County. K.S.A. 74-8702(f).

Every management contract must include terms and conditions for "ancillary lottery gaming facility operations" under K.S.A. 74-8734(h)(7), which has been defined as "additional non-lottery facility game products and services . . . [which] may include, but are not limited to, restaurants, hotels, motels, museums or entertainment facilities." K.S.A. 74-8702(a). The Kansas Lottery Commission is also the licensee and owner of all software programs associated with lottery facility games, and all such games are subject to Kansas lottery control. See K.S.A. 74-8734(n).

3

In 2010, the State entered a management contract with Peninsula Gaming, Kansas Star's former parent company. Paragraph 14 of the management contract stated, in part:

"[Peninsula], at its sole cost and expense, must diligently construct the buildings and related improvements for its Ancillary Lottery Gaming Facility Operations substantially in accordance with [its] Application for Lottery Gaming Facility Manager . . . and [its] representations to the Kansas Lottery Commission, Lottery Gaming Facility Review Board, the Kansas Racing and Gaming Commission, or the governing body of the city or county where the Lottery Gaming Facility is to be located . . . ."

Later in the same paragraph it states:

"In addition to any other remedy available . . . under this Agreement, solely with respect to this Paragraph 14, [Peninsula's] failure to substantially perform its Ancillary Lottery Gaming Facility Operations obligations according to objectively verifiable standards (for example, if the plans provide for the building of a restaurant and the restaurant is not built) and, provided such failure cannot be disputed in good faith, will authorize the [Kansas Lottery] to withhold payment of [Peninsula's] compensation for which it would otherwise be entitled . . . less such amounts necessary . . . to meet all cash operating payments, obligations and liabilities payable pursuant to the Budget and debt service payments payable to third-party lenders . . . ."

Boyd Gaming Corporation acquired Peninsula—and Kansas Star—in 2012. But Kansas Star has continued to operate as the gaming facility manager for the south central zone.

*Kansas Star's Property*

Construction of Kansas Star's building complex took place in multiple phases beginning in December 2011. During the initial phase, Kansas Star constructed a temporary casino housed in its arena. During the next phase, Kansas Star constructed its

4

permanent casino, which opened in December 2012. Once the permanent casino opened, Kansas Star converted the arena to its permanent configuration and held its first event in June 2013. The next phase of construction consisted of building the conference center and open-air event pavilion, which Kansas Star completed in January 2015. These buildings are all located on a 195.5-acre tract of land owned by Kansas Star.

It is undisputed that the Kansas Star Arena has not proven to be profitable. In every year that is has been fully operational, it has suffered an operating loss. Beginning in 2014, the arena suffered an operating loss of $707,691. It suffered an operating loss of $160,063 in 2015; $211,943 in 2016; and $9,452 in 2017. The operating loss only includes the total losses on individual events; it does not include fixed overhead expenses such as maintenance, utilities, and advertising.

Similarly, Kansas Star's equine facility has not been heavily used. In 2013, no equine events were held. In 2014, Kansas Star hosted 5 equine events over 12 days. In 2015—after the open-air event pavilion and stalls had been constructed—Kansas Star hosted five equine events over nine days. In 2016, Kansas Star hosted three equine events over eight days. And in 2017, Kansas Star hosted two equine events over six days. As a result, Kansas Star negotiated with the Kansas Lottery Commission and was allowed to scale back its permanent equine facilities—including the amount of practice arenas and permanent stalls—in favor of conference space. According to Kansas Star, it is open to hosting more equine events, but it has not had success in attracting them.

The underlying concern in each of the parties' appeals has been the valuation of Kansas Star for ad valorem tax purposes. At the heart of this concern is their opposite positions on the depreciation of the ancillary facilities. That continues to be the case.

In April 2019, BOTA held a two-day evidentiary hearing to determine the valuation of Kansas Star's property. The County first presented testimony from appraiser

Leslie Sellers, MAI. According to Sellers, BOTA needed to account for KELA and the management contract when determining the fair market value of Kansas Star. He noted that, even if Kansas Star might make more money without the ancillary facilities, the management contract required their construction. Thus, Sellers believed the property did not suffer from functional obsolescence except for the conversion of the temporary casino into the arena.

Next, the County presented the testimony of appraiser Richard Jortberg, MAI. Jortberg had appraised the Kansas Star for the County in each tax year since 2012, including 2018. Jortberg agreed with Sellers that BOTA needed to account for KELA and the management contract when determining the fair market value of Kansas Star. He noted that, even if Kansas Star might make more money without the ancillary facilities, the management contract required their construction. He said KELA enabled a casino to operate on the property, and the facilities built on the property had to comply with the management contract. He also believed Kansas Star's current configuration was the highest and best use of the property.

Since the current configuration of the Kansas Star property was the highest and best use, Jortberg explained this meant the property did not have a functional problem. As a result, Jortberg concluded the property suffered from no functional obsolescence. After combining his land value and reproduction costs estimates, then deducting depreciation, Jortberg concluded $180,000,000 to be the rounded fair market value of the property under the cost approach.

In response, Kansas Star presented the testimony of Robert Jackson, MAI, a certified general real property appraiser. Jackson prepared an appraisal report for Kansas Star that served as the basis of his testimony. Kansas Star also presented the testimony of Scott Schroeder, Kansas Star's Director of Finance, and Cory Morowitz, a gaming consultant.

Jackson explained that the property suffered from functional and external obsolescence in the form of superadequacy (just as he had opined in tax years 2016 and 2017). See *In re Equalization Appeals of Kansas Star Casino*, 2020 WL 2296977, at *4-5. To support his conclusion, Jackson noted that gaming revenue stabilized in 2012, the first year of operation, and the opening of the ancillary facilities did not have a significant impact on gaming revenues, despite projections to the contrary.

Similarly, Jackson analyzed the net revenue and net income of Kansas Star from 2012 through 2017. From 2013 through 2017, net revenue had been relatively flat, while net income reached its peak in 2012 and had not reached that level since. This led Jackson to conclude the ancillary facilities negatively affected Kansas Star's net income. As a result, Jackson concluded the ancillary improvements were 100% obsolete. After adding his land value and reproduction cost estimates, and then deducting depreciation, Jackson concluded that Kansas Star's fair market value under the cost approach was $78,100,000 for tax year 2018.

Schroeder testified about Kansas Star's difficulties in booking events at the arena, explaining that Kansas Star competes in a saturated market (it is one of four arenas in the Wichita area) and is at a disadvantage related to location and size. Schroeder also explained that Kansas Star sees little uptick in gaming revenue on days when events occur. Schroeder said the arena has never operated at a profit after accounting for comp tickets.

Schroeder explained that the equine events have been similarly unsuccessful. In his experience, the events were costly to host because of the preparation required. For example, it costs Kansas Star about $14,000 to haul dirt in and out of the arena. This cost, as well as other costs associated with staffing, cleaning, and security, reduce the profitability of the equine events. They also do not generate tourism like Kansas Star had hoped. Like arena event days, the equine events also do not generate a large increase in

7

gaming revenue. In sum, if Kansas Star could start construction from the beginning, Schroder believed it would not build the arena and conference center to maximize profitability.

Last, Morowitz testified about his analysis of the effect of the arena events on admissions and revenue. He said the arena operated "at minimal performance, it adds no value to the gaming operation, and it's—and from our terms as a gaming consultant, is functionally obsolete." To support his claim, Morowitz explained that Kansas Star's gaming revenue peaked midway through 2013, at approximately the same time the temporary casino had been converted to the arena. In the months following the arena's opening, gaming revenue declined before stabilizing near the end of 2014.

Morowitz reviewed admissions and revenue data for event and nonevent days. He explained that in the gaming industry, gaming revenue can be explained by the Pareto Principle, which states that roughly 20% of customers drive 80% of gaming revenues. On days when events take place, many of the people that come to a casino do not behave the same as a customer who comes to a casino specifically to game. Thus, while admissions and food and beverage revenues increase, gaming revenues do not enjoy the same positive impact. As evidence of this point, Morowitz presented data showing that Kansas Star had higher than average admissions 60% of Fridays and 71% of Saturdays when it had events. Yet during those same Fridays and Saturdays, Kansas Star experienced below average gaming revenues on 57% of Fridays and 47% of Saturdays. If admissions drove gaming revenue, Morowitz said the positive impact of admissions would more closely mirror the positive impact of gaming revenue. In sum, Morowitz, like Schroeder, believed the arena events provided no statistically significant effect on gaming revenue. The profit and loss statements of the arena reinforced this conclusion.

As for obsolescence, Morowitz said it was not atypical for a casino to overbuild. He said casinos often build additional facilities they do not need hoping to attain more

revenue, but these additions can add little or no value to the casino. He believed this to be the case with the arena, pointing to the fact that the arena is not often used.

Sometime after the hearing, BOTA issued its Full and Complete Decision. Both parties' experts testified the cost approach yielded the most reliable valuation results, and BOTA adopted this approach in its final valuation. BOTA adopted Jackson's conclusions about the commercial value of the casino and adopted factors from both parties' experts to determine the land value. As a result, BOTA concluded Kansas Star's total value was $78,913,590, which consisted of $78,903,300 commercial use value and $10,290 of agricultural use value. The parties have not appealed the portion of BOTA's opinion addressing the land value.

The County then petitioned for judicial review with this court.

ANALYSIS

*Standards of Review*

Under K.S.A. 74-2426(c)(4)(A), any aggrieved person has the right to appeal an order of BOTA by petitioning this court. This time, only the County petitioned for judicial review. We review BOTA's decision in the manner prescribed by the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., because BOTA orders are subject to KJRA review. K.S.A. 74-2426(c).

Tax statutes must be construed strictly in favor of the taxpayer. Interpretation of a statute is a question of law subject to de novo review. *In re Tax Appeal of BHCMC*, 307 Kan. 154, 161, 408 P.3d 103 (2017). Thus, the agency's interpretation of a statute is given no deference. See *May v. Cline*, 304 Kan. 671, 675, 372 P.3d 1242 (2016); *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013). This ruling was

specifically applied to BOTA decisions in *In re Tax Exemption Application of Kouri Place*, 44 Kan. App. 2d 467, 471-72, 239 P.3d 96 (2010).

> "When determining the validity of an assessment of real property for uniformity and equality in the distribution of taxation burdens, the essential question is whether the standards prescribed in K.S.A. 2013 Supp. 79-503a have been considered and applied by taxing officials. *Krueger v. Board of Woodson County Comm'rs*, 31 Kan. App. 2d 698, 702, 71 P.3d 1167 (2003), *aff'd* 277 Kan. 486, 85 P.3d 686 (2004)." *In re Equalization Appeal of Tallgrass Prairie Holdings*, 50 Kan. App. 2d 635, 649, 333 P.3d 899 (2014).

Eight standards under which an appellate court must grant relief are set forth in K.S.A. 77-621(c). The County relies on K.S.A. 77-621(c)(4), (c)(5), (c)(7), and (c)(8) to support its argument that relief should be granted. Under K.S.A. 77-621(c)(4), we grant relief if we determine that BOTA "erroneously interpreted or applied the law." Under K.S.A. 77-621(c)(5), we grant relief if we determine that BOTA "engaged in an unlawful procedure or has failed to follow prescribed procedure."

Under K.S.A. 77-621(c)(7), we grant relief if we determine that BOTA's "action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole." The statute then defines "'in light of the record as a whole'" to include the evidence both supporting and detracting from an agency's finding. K.S.A. 77-621(d). "'Substantial competent evidence possesses both relevance and substance and provides a substantial basis of fact from which the issues can be reasonably determined.' [Citation omitted.]" *In re Equalization Appeal of Wagner*, 304 Kan. 587, 599, 372 P.3d 1226 (2016). When reviewing the record, we do not reweigh the evidence or engage in de novo review. K.S.A. 77-621(d).

Finally, under K.S.A. 77-621(c)(8), we grant relief if we determine that BOTA's "action is otherwise unreasonable, arbitrary or capricious." The test for arbitrary and

capricious conduct under that subsection of the statute "relates to whether a particular action should have been taken or is justified, such as the reasonableness of an agency's exercise of discretion in reaching the determination, or whether the agency's action is without foundation in fact." *Lario Oil & Gas Co. v. Kansas Corporation Comm'n*, 57 Kan. App. 2d 184, 205, 450 P.3d 353 (2019) (citing *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 [2010]). The County, as the party challenging BOTA's action, has the burden of proving arbitrary and capricious conduct. See *In re Equalization Appeal of Tallgrass Prairie Holdings*, 50 Kan. App. 2d at 643.

*General Concepts of Ad Valorem Taxation*

Unless specifically exempted, all real and tangible personal property in Kansas is subject to taxation on a uniform and equal basis. Kan. Const. art. XI, § 1(a); K.S.A. 79-101. The Legislature enacted a statutory scheme to ensure property is appraised in a uniform and equal manner for ad valorem tax purposes. A central component of this statutory scheme is the requirement that property be appraised "at its fair market value as of January 1 in accordance with K.S.A. 79-503a unless otherwise specified by law." K.S.A. 79-1455.

Fair market value for ad valorem tax purposes has been defined as "'[a]bsolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.' The Appraisal of Real Estate, p. 114 (13th ed. 2008)." *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 130, 275 P.3d 56 (2012); see also *In re Equalization Proceeding of Amoco Production Co.*, 33 Kan. App. 2d 329, 336-40, 102 P.3d 1176 (2004) (holding Kansas ad valorem valuation contemplates valuation of the fee simple interest).

"Kansas tax statutes do not use the term 'fee simple'; however, it is clear that the legislative intent underlying the statutory scheme of ad valorem taxation in our State has always been to appraise the property as if in fee simple, requiring property appraisal to use market rents instead of contract rents if the rates are not equal. K.S.A. 79-501 requires that each parcel of real property be appraised for taxation purposes to determine its fair market value. In turn, K.S.A. 2010 Supp. 79-503a defines 'fair market value' as 'the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting *for property* in an *open and competitive market*, assuming that the parties are acting without undue compulsion.' (Emphasis added.) It is clear, therefore, that the fair market value statute values *property* rights, not *contract* rights." *In re Prieb Properties*, 47 Kan. App. 2d at 130-31.

This concept aligns with K.S.A. 79-102, which states: "[T]he terms 'real property,' 'real estate,' and 'land,' when used in this act, except as otherwise specifically provided, shall include not only the land itself, but all buildings, fixtures, improvements, mines, minerals, quarries, mineral springs and wells, rights and privileges appertaining thereto." This definition requires all rights and privileges in real property to be valued. But "[f]or purposes of ad valorem taxation, Kansas law requires the valuation of the fee simple estate and not the leased fee interest." *In re Prieb Properties*, 47 Kan. App. 2d 122, Syl. ¶ 6.

As stated, Kansas law assumes the hypothetical condition of an assumed sale as of January 1 of the applicable tax year when determining ad valorem valuation. As such, Kansas' statutory scheme "is a surrogate for a real marketplace event." *Hixon v. Lario Enterprises, Inc.*, 19 Kan. App. 2d 643, 646, 875 P.2d 297 (1994), *aff'd as modified* 257 Kan. 377, 892 P.2d 507 (1995). Practically speaking, the parties pretend "that each piece of property is sold on January 1 of the year in which the appraisal is done in an arm's length transaction." 19 Kan. App. 2d at 647. This is often called a hypothetical sale of the subject property.

Fair market value is the key to determining a value for the hypothetical sale. K.S.A. 79-503a provides:

"'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. In the determination of fair market value of any real property which is subject to any special assessment, such value shall not be determined by adding the present value of the special assessment to the sales price."

Additionally, K.S.A. 79-503a contains a list of nonexclusive factors to provide guidance on the methods that may be used to determine fair market value:

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:
(a) The proper classification of lands and improvements;
(b) the size thereof;
(c) the effect of location on value;
(d) depreciation, including physical deterioration or functional, economic or social obsolescence;
(e) cost of reproduction of improvements;
(f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;
(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;
(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes."

When determining hypothetical conditions under which a January 1 sale would take place, the fee simple interest must also be considered. While the fee simple interest of real estate consists of every stick in the bundle of rights, the hypothetical sale must only include the sticks in the bundle of rights and not include intangible interests or enterprise value. See K.S.A. 79-102 (stating only tangible property is taxable); *In re Tax Protest of Strayer*, 239 Kan. 136, 142, 716 P.2d 588 (1986) (intangible property interests are not taxable for property tax purposes).

Appraisals for ad valorem taxation purposes must comply with the Uniform Standards of Professional Appraisal Practice (USPAP). K.S.A. 79-506(a). In addition, the ad valorem appraisal process must "conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 79-503a. Whether an appraisal complies with USPAP, as required by K.S.A. 79-503a and K.S.A. 79-506(a), is an issue of law subject to de novo review. See *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d 881, 885, 891-92, 221 P.3d 598 (2009). For these reasons, "BOTA cannot apply a methodology the appraisers themselves could not." *In re Equalization Appeal of Kansas Star Casino,* 2018 WL 2749734, at *20.

With these concepts and standards in mind, we consider the County's arguments.

14

*BOTA's Cost Approach Analysis*

BOTA adopted the cost approach when calculating Kansas Star's fair market value, which neither party disputes as the proper approach. This court has stated that "[t]he cost approach has three components: (1) land value; (2) reproduction/replacement costs; and (3) depreciation." *In re Equalization Appeal of Kansas Star Casino*, 2021 WL 2021829, at *5. Neither party disputes BOTA's conclusions regarding land value or reproduction/replacement costs. BOTA valued Kansas Star's commercial use land at $10,124,400, which it arrived at by multiplying the per acre value of $76,700 by 132 acres of commercial use land. The parties stipulated that the 63.5 acres leased for agricultural purposes had an agricultural use value of $10,290. By adopting the rest of Jackson's conclusions, BOTA used a replacement cost new estimate of $159,210,363.

*Obsolescence and Highest and Best Use*

The County does not challenge any of these precise calculations. Instead, it argues BOTA's conclusion that the ancillary facilities are superadequate is erroneous because it does not comply with USPAP, is unsupported by substantial competent evidence, and is arbitrary and capricious. The County argues that BOTA erred in its depreciation analysis because it failed to consider the requirements of the management contract as part of its fair market value analysis. As such, the County argues Kansas Star's ancillary facilities do not suffer from functional obsolescence in the form of superadequacy as a matter of law.

"Functional obsolescence is caused by a flaw in the structure, materials, or design of an improvement when the improvement is compared with the highest and best use and the most cost-effective functional design requirements at the time of the appraisal." The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013).

Functional obsolescence can take two forms:  functional inadequacy and superadequacy. The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013). Here, the dispute centers on superadequacy. Superadequacy is "some aspect of the subject property [that] exceeds market norms." The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013). After identifying the flaws in the improvements on a given property, an appraiser must compare those flaws to the property's highest and best use. As a result, a property's highest and best use must first be determined when analyzing functional obsolescence. The Appraisal of Real Estate, Appraisal Institute, 623-24 (14th ed. 2013).

The Appraisal Institute defines highest and best use as "[t]he reasonably probable use of property that results in the highest value." The Appraisal of Real Estate, Appraisal Institute, 332 (14th ed. 2013). The four criteria for the highest and best use analysis are: (1) physical possibility; (2) legal permissibility; (3) financial feasibility; and (4) maximum productivity. The Appraisal of Real Estate, Appraisal Institute, 335 (14th ed. 2013). A use must meet all criteria to be considered. The Appraisal of Real Estate, Appraisal Institute, 332 (14th ed. 2013). Legally permissible uses "conform to the land's current zoning classification and local building codes along with any other relevant regulatory or contractual restrictions on land use." The Appraisal of Real Estate, Appraisal Institute, 334 (14th ed. 2013).

The Appraisal Institute also has a seven-step process to analyze the potential for functional obsolescence.

"1.  Identify the functional problem.
"2.  Identify the component (or components) in the facility, or the lack of a component (or components), association with the Problem.
"3.  Identify possible corrective measures and the related costs to cure.
"4.  Select the most appropriate corrective measure.

"5. Quantify the loss caused by the functional problem, which results in added value if the problem is corrected.

"6. Determine if the item is curable or incurable. (If the value added is equal to or greater than the cost to cure, the functional problem is curable.)

"7. Apply the functional obsolescence procedure to calculate the amount of depreciation caused by the functional problem." The Appraisal of Real Estate, Appraisal Institute, 626 (14th ed. 2013).

When Jortberg visited the property, he did not observe any issues with the construction materials or mechanical systems. He also concluded the property as constructed served as its highest and best use, mainly focusing on the legally permissive aspect of the highest and best use analysis. In his opinion, the ancillary facilities were all legally required. He did not believe Kansas Star had a functional problem, rendering the rest of the steps in the analysis superfluous. Thus, in his view, the property suffered from no functional obsolescence.

But BOTA rejected this argument. BOTA's final decision stated, in part:

"The Board finds the County's argument that the subject ancillary facilities have no functional obsolescence as these non-gaming improvements are the only legally permissible use of the property is in error. This argument was presented and fully adjudicated by the Board in its recent remand decision on the 2015 tax year appeal of the subject property, wherein the Board held as follows:

"'Examination of KELA does not indicate that an arena is specifically required for the operation of a casino of Kansas. KELA authorizes the Kansas Lottery Commission to approve a management contract with a prospective lottery gaming facility manager to manage a "lottery gaming facility" or "lottery gaming enterprise." K.S.A. 74-8734(e). KELA defines a "lottery gaming facility" as just a casino, whereas a "lottery gaming enterprise" is a casino and ancillary lottery gaming facility operations. K.S.A. 74-8702(m) and 74-8702(l). KELA defines "ancillary lottery gaming facility operations" as "additional non-

17

lottery facility game products and services . . . which may be included in the overall development . . . [that] may include, but are not limited to, restaurants, hotels, motels, museums or entertainment facilities." The subject property currently contains multiple restaurants and bars, as well as being attached to a separately owned hotel. Therefore, the subject property, both with or without the arena, satisfies the KELA requirements of either a "lottery gaming facility" or "lottery gaming enterprise." As such, while the arena is a requirement of Kansas Star's management contract, the arena is neither a statutory requirement of KELA, nor a specific requirement for obtaining a management contract.

"'The Board, further, finds that the County improperly equates Kansas Star's contractual obligations via the management contract with "legal obligations" or "land use restrictions" for purposes of determining fee simple real estate value for Kansas ad valorem taxation purposes. The Board finds this argument inconsistent with Kansas law. Kansas law is very clear that personal contractual obligations, such as leases, are not part of the fee simple interest in real estate to be valued for ad valorem tax purposes. *See In re Prieb Properties, L.L.C.*, 47 Kan. App. 2d at 131. (holding, in the context of sale leaseback agreements "[i]t is clear, therefore, that the fair market value statute values property rights, not contract rights.") Moreover, KELA explicitly provides that the management contract is not a land-use restriction as it "shall not constitute property, nor shall it be subject to attachment, garnishment or execution, nor shall it be alienable or transferable, except upon approval by the executive director, nor shall it be subject to being encumbered or hypothecated." K.S.A. 74-8734(m).

"'While the subject ancillary facilities were constructed to comply with the management contract and KELA, the Board has not been persuaded that the subject property, as currently comprised, is the only legally permissible configuration of the property as argued by the County. As such, the County's argument that the existing ancillary improvements are legally required and, therefore, the subject property suffers from no functional or external obsolescence is not supported.'"

18

Based on these conclusions, BOTA adopted Jackson's appraisal conclusions. As for the highest and best use as vacant, Jackson concluded it was "the development of a casino gaming facility that is appropriately sized and designed to meet the demand of the market, in order to maximize gaming associated revenues, while minimizing the capital investment."

The County believes KELA and the management contract prevents this conclusion because "[t]he management contract imposes use restrictions and building requirements that are legal requirements which are a factor that 'shall be used in connection' with determining fair market value under K.S.A. 79-503a(j)." Thus, the County contends BOTA cannot disregard the management contract when determining fair market value.

Yet as Kansas Star points out, a panel of this court rejected this argument in its opinion about the 2016 and 2017 tax years. See *In re Equalization Appeals of Kansas Star Casino*, 2020 WL 2296977, at *15-16. There, the panel held that "BOTA may take the management contract into consideration in valuing the subject property but is not required to do so." 2020 WL 2296977, at *16. The County essentially concedes this point, stating that it has filed a petition with our Supreme Court to review that decision. But our Supreme Court denied the County's petition for review shortly after it filed its brief in this case.

This court's most recent opinion on the 2014 and 2015 tax years reinforces this conclusion. Since the County did not have the benefit of seeing this opinion—which was released on May 21, 2021—before filing its brief here, it is unsurprising that its arguments in this appeal are the same as those presented in that case. Even so, this court has already rejected them. As for BOTA's 2015 tax year conclusions—which BOTA explicitly relied on in its tax year 2018 decision—the panel stated:

"The County overly equates KELA and Kansas Star's personal management contract. Kansas Star does not dispute that KELA is a land use restriction that applies to all land used for a casino. But the management contract is a *personal* contractual agreement between Kansas Star and the State to operate a casino. KELA provides that the management contract is not a land use restriction, as it '*shall not constitute property*, nor shall it be subject to attachment, garnishment or execution, nor shall it be alienable or transferable, except upon approval by the executive director, nor shall it be subject to being encumbered or hypothecated.' (Emphasis added.) K.S.A. 74-8734(m).

"Kansas law has long held that personal contractual obligations are not part of the fee simple interest in real estate to be valued for ad valorem tax purposes. As discussed, Kansas valuation statutes do not use the term 'fee simple.' Nevertheless, Kansas ad valorem valuation contemplates valuation of the fee simple interest. See *In re Equalization Proceeding of Amoco Production Co.*, 33 Kan. App. 2d at 337-40. K.S.A. 79-501 requires that each parcel of real property be appraised for taxation purposes to determine its fair market value. In turn, K.S.A. 79-503a defines 'fair market value' as 'the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for *property* in an *open and competitive market*, assuming that the parties are acting without undue compulsion.' (Emphases added.) 'It is clear, therefore, that the fair market value statute values property rights, not contract rights.' *Prieb Properties*, 47 Kan. App. 2d at 131.

"Additionally, Kansas Star's casino management contract has been excluded as property by another panel of this court. See *In re 2013 Equalization Appeal of Kansas Star Casino*, 2018 WL 2748748, at *13 (noting 'the management contract itself is not property,' although it may influence the value of real estate). The fact that a management contract can influence the value of real estate does not mean that the real estate improvements cannot suffer from obsolescence. And the County provides no support for a different conclusion. Here, the fact-finder found Kansas Star's management contract did affect the value of the real estate—in a negative way, because the arena was superadequate.

"Viewing the County's argument practically, it asserts that the management contract via KELA, which is a land use restriction, allowed construction of the property. But this argument, when broken down, is not entirely correct. It is correct that the management contract via KELA permits gaming on the property. However, KELA does not demand that the property only ever be used for gaming. The management contract

20

does not run with the land; it is an agreement between the State and Kansas Star. If Kansas Star were to sell the property, the contract would not follow it. As discussed, the ad valorem valuation assumes a hypothetical sale of the subject property on January 1. Assuming Kansas Star sold the property on January 1, 2015, its contractual right to operate the casino would *not* automatically pass with the sale of the property. True land use restrictions are like a piece of the twine holding a bundle of sticks together—the restriction dictates what kind of sticks will fit in the bundle and holds the sticks together, passing with the sticks themselves. The buyer of the property at issue here would be free to do with that property as it wished, so long as it was legally permissible. The *management contract* is what makes gambling legally permissible at the subject property, not KELA, and that management contract does not run with the land. See K.S.A. 74-8734(m).

"Kansas Star's owner could have built the facility to the exact specifications the property currently possesses even without the management contract. It is not the contract that allowed the casino to be constructed. Rather, the contract allows gambling to take place inside of the building; it has no bearing on the permissibility of the actual construction of the building. It is true that for Kansas Star's owner to be awarded the contract, Kansas Star Casino had to be built in accordance with that contract, but the contract only permits gambling inside of the building; it did not address construction of the building itself. Stated differently, the contract did not give permission to build—it gives permission to run a casino in the building so long as the terms of the contract are followed, with one of those terms being construction of the ancillary gaming facilities. Practically speaking, a reasonably prudent person would not build a multimillion dollar facility such as the Kansas Star facilities without having secured such a contract, but just because such a person *would* not build a facility does not mean he or she *could* not.

"Additionally, KELA simply requires a management contract. K.S.A. 74-8734(f). It does not require that the south central gaming facility be built just as the specifics of Kansas Star's management contract require. . . .

. . . .

"An arena simply is not required under the text of KELA. See K.S.A. 74-8702(a) ('"Ancillary lottery gaming facility operations" means additional non-lottery facility game products and services not owned and operated by the state which *may* be included in the overall development associated with the lottery gaming facility. Such operations may include, but are not limited to, restaurants, hotels, motels, museums or entertainment

21

facilities.' [Emphasis added.]). Even without the consideration of the arena, Kansas Star meets the definition with its hotel, bars, and restaurants. Looking outside of Kansas Star's situation, it is clear KELA does not require an arena. Hollywood Casino, the gaming facility in the northeast gaming zone, is an 'approximately 245,000-square foot building [that] includes a Las Vegas-style casino with a 94,444-square foot gaming floor; a steak house, buffet, sports bar, mid-level restaurant, coffee shop, and VIP lounge; office and administrative space; 1,253 covered parking spaces; and additional surface parking.' *In re* [*Equalization Appeal of*] *Kansas Entertainment*, [No. 117,406,] 2018 WL 6713975, at *2 [(Kan. App. 2018) (unpublished opinion)]. Notably, that KELA-approved casino does not have an arena. If such an ancillary gaming facility were truly a requirement of KELA, Hollywood Casino would not be in operation.

"To counter these considerations, the County cites to K.S.A. 79-503a, which requires 'other factors' be used when assessing fair market value. One of those factors is

'restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended.' K.S.A. 79-503a(j).

"The County's argument overlooks the phrase 'imposed upon the use of real estate.' It is not disputed that government requirements and regulations are part of the fee simple estate. The plain text of this provision does not require that private government contracts be considered as part of the fee simple interest in real estate. But see *In re Equalization Appeal of Ottawa Housing Ass'n*, 27 Kan. App. 2d 1008, Syl. ¶ 7, 10 P.3d 777 (2000) ('Taxing authorities should consider the effects of low-income housing contracts when valuing property for ad valorem taxes.'). The management contract here was awarded, not imposed, and it is not a restriction or a requirement imposed on the land or any subsequent owner. By contrast, low-income housing contracts are recorded, run with the land, and bind future owners. *In re Equalization of Paola-Sundance Apartments*, No. 2004-8772-EQ, at *1 (Kan. Bd. Tax. App. 2006). The management contract is the vehicle by which Kansas Star is *permitted* to use the real estate for its gaming operations. It is not a restriction on all possible uses of the land and improvements thereto in and of itself. The contract is a personal obligation, not a consideration of the property.

22

> "Essentially, the County argues that the ancillary gaming facilities can never be deemed superadequate as a matter of law. But superadequacy is a question of fact, and 'our job is not to make a factual determination of the value . . . . That task is for BOTA.' *In re Equalization Appeal of Andover Antique Mall, L.L.C.*, 33 Kan. App. 2d 199, 209, 99 P.3d 1117 (2004).

> "With all these considerations in mind, we conclude that while BOTA *may* consider the management contract in valuing the property at issue here, it is not required to do so. . . ." *In re Equalization Appeal of Kansas Star Casino*, 2021 WL 2021829, at \*20-22.

We also note that our Supreme Court similarly denied the County's petition for review of that opinion in September 2021.

We see no reason to depart from the persuasive analysis in those opinions. Thus, we similarly conclude that BOTA did not err when it concluded the ancillary facilities diminished the value of Kansas Star's real estate based on superadequacy. Next, we turn to whether BOTA complied with USPAP requirements when computing depreciation.

*Depreciation Calculation*

In our final step, we must determine whether BOTA's functional obsolescence calculation follows USPAP requirements. A panel of this court previously identified the USPAP-compliant five-part functional obsolescence method:

> "In calculating depreciation for functional obsolescence, the Appraisal Institute provides a five-step formula: (1) identify the cost of the existing item; (2) deduct depreciation previously charged; (3) if functional obsolescence is curable, add up all of the costs associated with curing the item, and if incurable, add value of the loss; (4) if curable, subtract cost of the proper item if included in new construction, and if incurable, subtract depreciated cost of the proper item if included in new construction; (5) add up all the entries to derive the total functional obsolescence attributable to each factor. The

23

Appraisal of Real Estate, Appraisal Institute, 627 (14th ed. 2013). . . ." *In re 2015 Equalization Appeal of Kansas Star Casino,* 2018 WL 3486173, at \*15.

BOTA determined the Kansas Star property suffered from functional obsolescence based on undisputed evidence that Kansas Star's gross revenues were relatively flat from 2012 through 2017, despite construction spending spiking from 2012 to 2014. BOTA also found the evidence suggested the ancillary facilities were unprofitable, not needed to serve the market, and contributed to an overall reduction in earning before interest, tax, depreciation, and amortization from 2012 through 2017. While BOTA did not walk through each of the five steps stated above, it explicitly stated it adopted Jackson's functional obsolescence calculation.

Jackson estimated the cost of the original property to be about $70,474,972. To reach that number, Jackson combined the costs of "Phase 1A – Net Costs for Existing Subject Property" and "Phase 2 – Total Costs," less the costs of paving necessary to support the permanent casino and utilities. Jackson's cost figure, representing the costs of the ancillary facilities, accounted for 52% of the cost of the Kansas Star property. To calculate the final number used in his analysis, Jackson took the total replacement cost new ($159,210,363), subtracted 10% ($15,921,036) for physical deterioration, and then calculated 52% of that number, arriving at a total obsolescence figure of $74,510,450.

| (Total Replacement Cost – Physical Deterioration) * .52 = |
|---|
| ($159,210,363 - $15,921,036) * .52 = $74,510,450 |
| (Total Replacement Cost – Physical Deterioration) * .48 |
| ($159,210,363 - $15,921,036) * .48 = $68,778,877 |

As mentioned above BOTA used the cost approach method to determine the tax year 2018 fair market value, as it had for tax years 2015 through 2017. To do so, it added the land value and replacement costs, then subtracted the physical deterioration—

assessed at 10%—and functional obsolescence. The following table depicts the calculation.

| Land Value | $10,124,400 |
|---|---|
| + replacement cost (new) | + $159,210,363 |
| - physical deterioration (10%) | - $15,921,036 |
| - functional obsolescence | - $74,510,450 |
| = Commercial Use Value | = $78,903,277 |
| | |
| Rounded Final Commercial Use Valuation | $78,903,300 |
| + Stipulated Agricultural Land Use Value | + $10,290 |
| = Total Value | = $78,913,590 |

In this court's most recent opinion on Kansas Star, the panel approved the preceding depreciation analysis for tax year 2015. See *In re Equalization Appeal of Kansas Star Casino*, 2021 WL 2021829, at *17-18. The County offers no reason why this panel should not do the same.

Nothing distinguishes BOTA's decision and reasoning in the appeal from the 2018 tax year from its last two decisions on the ancillary facilities depreciation in the 2015, 2016, and 2017 tax years. As a result, we affirm BOTA's decision on the fair market value of Kansas Star.

Affirmed.